505 So.2d 1050 (1987)
AETNA LIFE INSURANCE COMPANY
v.
Margaret W. LAVOIE and Roger J. Lavoie, Sr.[*]
82-426, 82-1152.
Supreme Court of Alabama.
March 27, 1987.
Peter V. Sintz and William M. Cunningham, Jr., of Sintz, Campbell, Duke, Taylor & Cunningham, Mobile, for appellant.
Joseph M. Brown, Jr., of Cunningham, Bounds, Yance, Crowder and Brown, Mobile, for appellees.
PER CURIAM.
This case is on remand from the Supreme Court of the United States. This is the *1051 fourth time it has been before this Court.[1] On June 5, 1986, we ordered this case rebriefed. After careful reconsideration of the record and the arguments of counsel, we uphold the trial judge's denial of appellant's (Aetna's) motion for directed verdict and its post-trial motion for J.N.O.V. The trial court's denial of appellant's post-trial motion for a new trial on the ground of excessiveness of the verdict is affirmed on the condition that appellees (the Lavoies) file with this Court, within 21 days, a remittitur in the sum of $3,000,000.00.
The facts are as follows: In January of 1977, Mrs. Lavoie was examined by her physician, Dr. John B. Douglas, complaining of various ailments. Dr. Douglas recommended that she be admitted to the Mobile Infirmary for evaluation and treatment. Mrs. Lavoie remained hospitalized for 23 days, during which time a battery of tests was performed on her in accordance with Dr. Douglas's instruction.
After her discharge, the infirmary forwarded certain medical records (including the admitting sheet, the admission history and physical, the doctor's orders, the discharge summary, and extraneous information such as lab reports, etc.) and a bill for $3,028.25 to Aetna's local office in Mobile.[2] In April of 1977, Brenda Harris, a claims worker in the local office, sent a letter to Jean Becker, a "senior claims examiner" at Aetna's home office in Hartford, Connecticut, indicating Harris's conclusion that the entire period of hospitalization was unnecessary and that "[h]ospital records do not indicate anything to the contrary," despite the fact that all of the hospital records had not been received by Aetna. (The nurses' notes and patient's progress notes were not in the Lavoie medical file.) On April 27, 1977, Ms. Becker denied payment of the hospital bill and certain of the diagnostic tests ordered by Dr. Douglas (the EEG, the EKG, and the CAT-scan). The local office refused to pay the entire amount, tendering payment for only $1,579.74. The refusal to pay was made pursuant to the insurance contract, the pertinent parts of which provide:

"ARTICLE IIBENEFITS

"COVERED MEDICAL EXPENSES
"Covered Medical Expenses are the reasonable charges which an employee is required to pay for the following services and supplies received by a covered family member for the necessary treatment of any non-occupational injury or non-occupational disease:
"HOSPITAL EXPENSES: These are the charges made by a hospital, in its own behalf, for (a) Board and room....
"...

"EXCLUSIONS, LIMITATIONS AND PROVISIONS APPLICABLE TO ALL TITLES UNDER ARTICLE II
"...

*1052 "No insurance is afforded under any Title of Article II as to charges
"...
"(5) for care, treatment, services or supplies which are not necessary for the treatment of the injury or disease concerned nor to the extent that any charges for care, treatment, services or supplies are unreasonable...."
Although there is no written policy, Aetna's witnesses agreed that before a "complicated" medical claim could be denied, a member of Aetna's medical department must review the file. The medical department included 6 physicians.
Dr. Bernard Swann, a physician employed by Aetna to review claims and a member of the medical department, was assigned the Lavoie file. Although a dispute arose over whether Dr. Swann's handwritten records reflected that he reviewed the Lavoie file on April 28, 1977, a day after the claim was denied, or whether he reviewed the file on April 25, 1977, Swann acknowledged in his notes that certain important medical records (the nurses' notes and the patient's progress notes) were not in the file.
The Lavoie claim was denied on three more occasions: on November 9, 1977, in accordance with the instruction of Tom Hutton, a senior claims examiner in the Hartford, Connecticut, office, to Harris;[3] on December 20, 1977, again on instruction from Hutton to Harris;[4] and finally on July 28, 1978, when R.E. Mann, another senior claims examiner in Hartford, instructed the Mobile office to continue the denial.[5]
Chavers v. National Sec. Fire & Casualty Co., 405 So.2d 1 (Ala.1981), promulgated the test for bad faith refusal to honor claims with an insurance company. Justice Beatty, in Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981), summarized and explained the two tiers of the bad faith tort. The first tier of the Chavers test establishes that the tort arises when there "exists `[1] no lawful basis for the refusal coupled with [2] actual knowledge of that fact'". The second tier of the test is an elaboration on the first. If the plaintiff cannot prove actual knowledge, the second tier offers plaintiff the alternative of proving that the insurer intentionally failed to determine whether there was an arguable reason for denying the claim. If the jury finds an intentional failure on the part of the insurer to determine whether there was any lawful basis for the refusal of the claim, it may use that fact in finding "actual knowledge."
"The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured ... [T]he insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact, i.e., the jury." 405 So.2d 916, 924.
Clearly, it was Aetna's responsibility to marshal all of the medical facts with regard to Mrs. Lavoie's claim before its *1053 refusal to pay. The items which were absent from the file, the progress notes and the nurses' notes, were conceded by Aetna's own witnesses to be of critical importance in the review of any medical file where the reasonable necessity of hospitalization is in issue. Dr. Swann testified, "[N]ormally you'd like to see particularly that a nurses' notes [are] included in the record," and "Over a year later ... more information was sent and also a letter from Dr. Douglas concerning the admission ... but the critical thing [that] came was the nurses' notes."
Dr. Roy Mason Arnold, M.D., one of Aetna's expert witnesses, confirmed the importance of these documents:
"Q. Would you agree that if Aetna Insurance Company had these medical reports in their file that they should have been shown to the physician who was reviewing them, i.e., Dr. Swann?"
"A. Yes, sir, I agree with that."
"[T]he decision of the insurance company to deny a claim under an insurance policy must be judged by what was before it at the time the decision was made." Insurance Company of North America v. Citizensbank of Thomasville, 491 So.2d 880, 883 (Ala.1986), citing Federated Guaranty Life Ins. Co. v. Wilkins, 435 So.2d 10 (Ala.1983). Considering the fact that the decision to deny was made without the benefit of "critical" sections of the medical file, the jury could find that the claim was not "properly investigated," and that there was a "reckless indifference to facts or to proof." Even Dr. Arnold, Aetna's own witness, after a review of all the records, would have approved payment for some time in the hospital:
"A. In my opinion, based on my review of the entire medical record, I probably would have certified somewhere between three and five days of inpatient care.
"...
"Q. Even you would have agreed to pay for the EKG, wouldn't you, Doctor? [One of the medical tests for which the claim for payment was denied.]
"A. Yes, sir."
Another aspect of the case is the insureds' contention that Dr. Swann did not examine the medical records until one day after the first refusal to pay. Because of the foregoing discussion of the inadequacy-of-the-investigation issue, the controversy surrounding the date of Dr. Swann's recommendation to refuse payment need not be addressed here.
The question of whether the bad faith is to be tested at the time of the first denial, or at the time of subsequent denials, is of no consequence in this case, because the deficiency in the medical records continued through the first three successive denials. Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place. "[A]n insured purchases insurance and not an unjustified court battle when he enters into the insurance contract." Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916, 925 (Ala.1981). Thus, the jury could have found that Aetna exhibited reckless indifference to the facts or to the proof submitted by the Lavoies on their claim, thereby satisfying the "actual knowledge" element of the testand it is evident, from their verdict, that they did. Facts certainly exist which support the jury's conclusion.
Under ordinary circumstances, we would remand this cause to the trial court for reconsideration of the excessiveness-of-the-verdict issue pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986). Because of the long history of this case, and other extraordinary attending circumstances, however, we feel constrained to forgo the Hammond remand procedure and determine the issue of damages without further delay. After careful and thoughtful consideration, taking into account the gravity of the wrong, the nature and extent of the injury inflicted upon the insureds, and, upon making a comparative analysis with other awards allowed in similar cases, we hold that the trial court's order denying the insurer's motion for a *1054 new trial should be affirmed on the condition that the insureds file with this Court within twenty-one days a remittitur of damages in the sum of $3,000,000; otherwise, the judgment will be reversed and this cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
JONES, ALMON and ADAMS, JJ., concur.
MADDOX, HOUSTON, and STEAGALL, JJ., concur specially.
SHORES and BEATTY, JJ., dissent.
TORBERT, C.J., recuses.
MADDOX, Justice (concurring specially).
In this special concurrence I will set out the history of this particular case, the history of the tort of bad faith refusal to pay an insurance claim, the positions taken by the various members of the Court on the tort's application, the alternative remedies which certain members of the Court have suggested should be adopted, the public policy considerations which address themselves to the legislative branch of government, and why I am of the opinion that in the interest of justice, this case should come to a conclusion.

I

The History of This Case
In Lavoie v. Aetna Life & Cas. Co., 374 So.2d 310 (Ala.1979), this Court set out the nature of the plaintiffs' claim as follows:
"Appellants, Margaret W. Lavoie and Robert J. Lavoie, Sr., filed a five-count complaint seeking recovery from appellee insurance company for non-payment of benefits allegedly due Mrs. Lavoie under a group medical insurance policy. Appellants claimed both compensatory and punitive damages. The first count alleged breach of contract. The second count alleged reckless, wanton, malicious, oppressive, and outrageous conduct on the part of appellee in refusing to honor the claim thereby causing Mrs. Lavoie severe emotional distress. The third count alleged breach of appellee's implied duty to deal in good faith and to exercise reasonable care in the performance of its contractual obligations. The fourth and fifth counts contained Mr. Lavoie's claim for loss of consortium based upon the second and third counts. The trial court granted appellee's 12(b)(6) motion as to all counts except the first. Final judgment was entered in accordance with ARCP 54(b), and the Lavoies appeal."
374 So.2d at 310.
The sole issue presented for review in that case was whether the complaint failed to state a claim for relief. In that case, this Court held as follows:
"At the outset, we note that Mrs. Lavoie is attempting to recover for the `tort of outrage,' that is, she alleges a claim for relief in tort for the bad faith refusal of the insurer to pay legitimate benefits due under a policy of insurance. This court has neither accepted nor rejected such a theory of recovery. Childs v. Mississippi Valley Title Insurance Co., 359 So.2d 1146 (Ala.1978). This view was most recently reiterated in Vincent v. Blue Cross-Blue Shield, 373 So.2d 1054 (Ala.1979): `[T]his court might, under appropriate circumstances, recognize a tort action for the wrongful refusal to pay a valid claim....' However, we added: `[But] facts supporting such circumstances have not been developed here. For us to attempt to delineate circumstances, or to hypothesize facts under which the court would recognize a tort claim in the posture of this case, would amount to no more than an advisory opinion. We, therefore, decline to do so.'
"Whether appellants are entitled to relief under such a theory of recovery is not at issue in the instant appeal. Rather what is at issue is the sufficiency of the complaint under ARCP 12(b)(6).
"... If after development of the facts it appears that the plaintiff is entitled to no relief, then summary judgment is the appropriate procedure to dispose of the claim. Trabits v. First National Bank of Mobile, [295 Ala. 85, 323 So.2d *1055 353 (1975)]. See Vincent v. Blue Cross-Blue Shield, supra.

"In the instant case, we cannot say that as a matter of law appellants could not prove any set of facts which would entitle them to the relief requested. As previously mentioned, this court has not foreclosed the possibility of recovery in tort for the bad faith refusal of an insurer to pay legitimate benefits due under an insurance policy. Vincent and Childs expressly recognized that the facts in a particular case may be such as to warrant recovery under the theory herein advanced. Thus, a plaintiff should not be foreclosed in the pleading stage because this court has not heretofore recognized recovery under such a theory. This is not to say, however, that this court will in fact recognize such a theory. It merely means that sufficient facts have not been presented in an actual case so as to genuinely pose the issue for our decision one way or the other.
"Accordingly, it is the facts of an actual case which will breathe life into the legal theories now advanced by appellants, and their claims should not be summarily dismissed at the pleading stage. Therefore, appellee's 12(b)(6) motion should have been overruled. Of course, denying the 12(b)(6) motion does not preclude a later determination at trial or on motion for summary judgment that appellants are not entitled to the relief requested."
374 So.2d at 311-12 (emphasis added).
The case went back to the trial court, extensive discovery was undertaken, and on February 13, 1980, Aetna filed its first motion for summary judgment, which was denied on February 29, 1980. On September 22, 1980, Aetna filed a second motion for summary judgment, and on October 17, 1980, the trial court granted Aetna's motion for summary judgment as to the plaintiffs' second, third, fifth, and sixth causes of action, and simultaneously entered a judgment for the plaintiffs on the first and fourth causes of action dealing with the contractual indebtedness claim by the plaintiffs.
A second appeal arose from the trial court's granting of Aetna's summary judgment on the above-mentioned claims. Lavoie v. Aetna Life & Cas. Co., 405 So.2d 17 (Ala.1981). In reversing the judgment and remanding the cause to the trial court, this Court stated:
"In a recent decision, this Court recognized the intentional tort of bad faith in first party insurance actions. Chavers v. National Security Fire and Casualty Company, 405 So.2d 1 (Ala.1981). The judgment of the Circuit Court of Mobile County, therefore, is reversed and remanded with directions to that court to reconsider the insurer's motion for summary judgment in the light of the teachings of Chavers."
405 So.2d at 18.
The case was then tried and Aetna filed an appeal; this Court affirmed in Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060 (Ala.1984). After Aetna's application for rehearing was overruled, Aetna appealed to the Supreme Court of the United States, and that Court reversed and remanded the case to this Court on the ground that this Court should have granted Aetna's motion to recuse because one of the Justices of this Court who participated in the case was disqualified to participate in the decision. Aetna Life Ins. Co. v. Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986). Since the decision made by this Court in the third appeal, Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060 (Ala.1984), two members of the Court who participated in that opinion have left the Court, and the Chief Justice has recused himself from participating in the case for a just cause. The Chief Justice's reason for recusal now was not present when he participated in the three prior appeals.
As already shown, this case grew out of a refusal of Aetna to pay for a hospital confinement and for certain diagnostic tests made during that confinement, which occurred between February 3 and February 25, 1977over ten years ago. I am of the opinion that it is now time for this *1056 Court, as presently constituted, to resolve this conflict.
When this case was first filed, the tort of bad faith refusal to pay an insurance claim had not been recognized by this Court. It was first judicially adopted by this Court in Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala.1981), with the Chief Justice and Associate Justices Maddox, Almon, and Embry, dissenting; therefore, the new judicially created tort was adopted by a Court which was divided on the form of the remedy to be given in factual situations similar to the one we have here. Several members of the Court had expressed separate views on the public policy considerations involved in this kind of lawsuit in Vincent v. Blue Cross-Blue Shield, 373 So.2d 1054 (Ala.1979). Needless to say, this Court has had difficulty with this kind of claim from the beginning. In any event, recognition of the new tort action was not in effect, and was not the law of this state when the event which gave rise to this lawsuit occurred, and that may be one of the reasons why this particular case poses so many problems. Because the tort was in its embryonic stage is probably one of the reasons the Court is requiring such a substantial remittitur in this case.
The tort of bad faith was in the developmental stage when the alleged tort occurred, and when this lawsuit was filed. Nevertheless, we must decide the case based upon the law as it now exists, and in view of the tort's own unique history.

II

This is Not a Bad Faith Case, but Other Remedies are Available
I am still of the opinion that this is not a bad faith case, and I believe the views I expressed in my original dissent in this case are sound, but I believe the result reached here is just under the facts of this case, based upon principles of contract law. In this special concurrence I will spell out the public policy considerations involved, and suggest what I believe would be the best way to solve the public policy issues, and why I concur in the result in this particular case.

III

The Public Policy Considerations
The failure of insurance companies to pay what their insureds thought were just claims has been the subject of much litigation in the past few years, and the judicial branch of government has been the primary vehicle used by citizens to address this question. From the beginning, I have been troubled by the fact that principles of contract law, in cases dealing with insurance contracts, were inadequate to do complete justice, but I was hesitant, as a member of the judiciary, to attempt to fashion a remedy to right a wrong which the people of this state, and in fact, the people in other states as well, considered to be a wrong, because any remedy involves public policy issues.
These public policy considerations, of extending the remedies available, beyond those available ex contractu, have been a source of concern for me since the subject was first addressed in this Court. Of course, it was the settled law of this state that insureds were not allowed to recover for personal injury, inconvenience, annoyance, or mental anguish and suffering in an action for breach of a contract of insurance. Vincent v. Blue Cross-Blue Shield, 373 So.2d 1054 (Ala.1979); Sanford v. Western Life Insurance Co., 368 So.2d 260 (Ala.1979); Stead v. Blue Cross-Blue Shield, 346 So.2d 1140 (Ala.1977); see, also, Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976); Liberty National Life Insurance Co. v. Stringfellow, 38 Ala.App. 594, 92 So.2d 924 (Ct.App.1956), cert. denied, 265 Ala. 561, 92 So.2d 927 (1957); aff'd on second appeal, 270 Ala. 80, 116 So.2d 595 (1959).
In Vincent, however, I joined the majority in stating the following:
"We also affirm the trial court's order granting summary judgment on the count seeking damages in tort for the failure of Blue Cross to pay the claim as initially filed.

*1057 "We reiterate what we said in Childs v. Mississippi Valley Title Insurance Co., 359 So.2d 1146 (Ala.1978), and Old Southern Life Insurance Co. v. Woodall, [295 Ala. 235, 326 So.2d 726 (1976)]. While this court might, under appropriate circumstances, recognize a tort action for the wrongful refusal to pay a valid claim, facts supporting such circumstances have not been developed here. For us to attempt to delineate circumstances, or to hypothesize facts under which the court would recognize a tort claim in the posture of this case, would amount to no more than an advisory opinion. We, therefore, decline to do so."
It should have been apparent from what a clear majority of this Court stated there that the Court was considering remedies other than those provided by contract law to correct a wrong which the Court recognized could and probably did exist.
If one will look at the opinions of this Court, those written by the majority and those written by the dissenters, in these cases, it is apparent that there are serious public policy considerations involved which are difficult for me, and I believe for this Court, to address.
The same public policy considerations which plagued me in Chavers, when the tort was recognized, continue to plague me, and those public policy considerations are: What type of remedy should be employed when an insurer fails to pay a valid claim made by its insured? What is the measure of damages? Should this Court be deciding these public policy issues? In Continental Assur. Co. v. Kountz, 461 So.2d 802 (Ala.1984), I articulated succinctly my own individual views concerning how I thought this Court should treat these "bad faith" cases, in the absence of legislative action. There, I wrote:
"These `bad faith' cases, unfortunately, in my opinion, fail to give to the bench and bar some settled principles to guide them in determining when, and under what circumstances, the tort can be established. That is the reason I consistently dissented, until I joined every member of the Court in National Security Fire and Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984), in which this Court concluded that a plaintiff had a very heavy burden in establishing a bad faith failure to pay, and that that burden was to show that the insurer, to quote from Vintson, `had no legal or factual defense to the insurance claim.' The Vintson test at least provided a more objective standard which trial judges, lawyers and appellate judges could apply...."
461 So.2d at 811.
Because I was the lone dissenter, I felt compelled to state the reasons for my dissent. I stated the following:
"By dissenting in this case, and in others presented to this Court, I may appear to believe a plaintiff in a case such as the present one should be limited to his usual contract damages, but I have no such views, and have never entertained them. The Chief Justice, in his dissent in Lavoie, using a principle which I have long held to be the law, has suggested what I believe would be a sound rule of law to establish in these insurance contract cases. He suggested that this Court should adopt a rule that would restrict the cause of action, in situations such as exist here, to one sounding in contract, but expand the contractual damages rules for non-commercial insurance contracts. To me, that would be a just and fair rule which could be easily applied, and would be a rule this Court could unanimously adopt. Of course, the Legislature is the body normally relied upon to correct any ills which might exist in the insurance industry regarding payment of insurance claims, but in the absence of legislation, I would favor a rule of law which would allow the recovery of consequential damages, including reasonable attorneys' fees, when a party is forced to go to court to establish his claim under an insurance policy.
"The failure of insurers to promptly pay what policyholders consider just claims is of great public concern. That concern is evidenced by the proliferation of cases in which policyholders seek not only redress under the contract, but also punitive damages under a `bad faith' theory, and juries are responding with verdicts of such magnitude that this Court has seen fit to require remittiturs.

*1058 "As I have already stated, in our scheme of government, policy questions like this, especially since they involve the heavily regulated insurance industry, should properly be addressed by the Legislature, but the Legislature has not acted.
"Another concern of mine is the fact that because of this Court's adoption of the `bad faith' tort, there very well may be instances when insurance companies pay claims which factually should be denied; nevertheless, the company opts to pay rather than face the possibility of a lawsuit. If those instances do occur, then premiums for all other policyholders necessarily rise to offset these added costs. On the other hand, there no doubt are instances when companies require policyholders to resort to a court suit, even though the factual basis for denial of a claim is questionable. The fairest rule, it would appear to me, in view of these two policy considerations, would be one which would allow any party to a noncommercial insurance contract, who is forced to go to court in order to recover his contract claim to recover his consequential damages as well, including reasonable attorneys' fees.
"In summary, I believe the judicially created tort of `bad faith' has serious policy ramifications which could and should be addressed by the legislative body of our government. I, nevertheless, feel that, in some cases, damages in addition to those provided for by the contract are necessary to make the policyholder whole.
"Consequently, I would apply the rule which I believe would be just in this case and would reverse the judgment awarding punitive damages, but would remand the cause to the circuit court for a determination of the consequential damages which the plaintiff suffered as a result of the breach."
461 So.2d at 811-812 (footnotes omitted).

IV

The Legislature Should Address the Public Policy Issues
I am still of the opinion that the Legislature is the appropriate branch of our government to pass on matters of great public concern such as exist in this area. It has the ability to hold public hearings, and the right to investigate the need for additional legislation, and it has the plenary power to balance the competing interests of the insured and the insurer, and arrive at a solution which will be in the best interest of the public.
I was not alone in suggesting attractive alternatives to the tort of bad faith refusal to pay insurance claims, and in calling on the Legislature to address them. The Chief Justice, in his dissenting opinion in this case on the third appeal, suggested that the Court should consider alternatives. He noted:
"By making it attractive to sue alternatively, or even exclusively, in contract, this Court could have avoided many of the problems associated with developing a new tort. As an added benefit, much of the appellate workload would be reduced in reviewing excessive jury awards of punitive damages, since punitive damages are not available in contract."
Aetna Life Ins. Co. v. Lavoie, 470 So.2d at 1080.
In his dissenting opinion, he further stated:
"The whole question of bad faith by insurance companies might be an issue more properly addressed by the legislature. The existing regulation of the insurance industries is a public-policy recognition by this state that consumers need some protection in this field. A proper balance between the two competing policy objectives inherent in claims of first-party bad faith must be struck."
Aetna Life Ins. Co. v. Lavoie, 470 So.2d at 1080-81.
The Legislature, in 1981, addressed some of the policy considerations surrounding health and accident insurance policies (see Code 1975, § 27-1-17), but it has not addressed the alternative which the Chief Justice suggested in his dissenting opinion in this case on the third appeal, namely, the recovery of consequential or other damages *1059 by an insured in non-commercial cases, when an insurer willfully fails to pay a valid claim. In fact, the Chief Justice said that limiting a claimant to recovery of the face amount of the claim plus interest was not a sufficient deterrent. He wrote:
"In severely limiting contractual damages to the face value of the policy plus the legal rate of interest, the law created an incentive for insurers to refuse payment of even legitimate claims. The insurers had nothing to lose, and everything to gain, by refusing payment of even meritorious claims. At most, the assessed damages would equal the limits of the policy plus the legal rate of interest (sometimes far below the actual market rate). Any tangible consequential economic damages, such as loss of job or bankruptcy, and intangible damages, such as emotional distress, were borne entirely by the insured, on the basis that certainly they were not within the contemplation of the bargain of the parties. Consequential losses were allowed to lie where they fell, even in the case of intentional breach of contract."
470 So.2d at 1079. (Emphasis added.)

V

This Case Should be Resolved Now
While I am still of the opinion that the Legislature is the appropriate branch of our government to address these policy considerations, and that this is not a "bad faith" case, I believe that justice requires the disposition of this particular case now. As I have already shown, this Court, when it reversed the judgments on the first two appeals, suggested that this might be a "bad faith" case. Much of the same evidence presented at trial was available to this Court in the second appeal, when we reversed the summary judgment in favor of Aetna.
Another reason why I believe this litigation should end is that since I dissented in this case on the third appeal, a new issue has been injected into the casewhether the punitive damages award violates any rights guaranteed to Aetna under the Excessive Fines Clause of the Eighth Amendment. In Aetna Life Ins. Co. v. Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986), the Supreme Court of the United States did not address this issue, but indicated that it might "in an appropriate setting." The Court noted:
"Appellant also argues that the retrospective imposition of punitive damages under a new cause of action violates its rights under the Contracts Clause of Article I, Section 10; that a $3.5 million punitive damage award is impermissible under the Excessive Fines Clause of the Eighth Amendment; and that lack of sufficient standards governing punitive damage awards in Alabama violates the Due Process Clause of the Fourteenth Amendment. In addition, appellant contends that Ala.Code § 12-22-72 (1975), under which any person who unsuccessfully appeals a money judgment is assessed 10% penalty, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. These arguments raise important issues which, in an appropriate setting, must be resolved; however, our disposition of the recusal-for-bias issue makes it unnecessary to reach them." (Emphasis added.)
Aetna Life Ins. Co. v. Lavoie, ___ U.S. ___, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986).
It appears to me that the Supreme Court of the United States may accept for review a punitive damages award made in a civil case and review it under the Excessive Fines Clause of the Eighth Amendment to the Federal Constitution,[1]in an appropriate setting.
If I apply the consequential damages standard set out in the Chief Justice's suggested alternative in his dissent on the *1060 third appeal, 470 So.2d at 1079-82, and the standard I suggested in my dissent in Kountz, I believe the record in this case would support an award in the sum of $500,000. The plaintiff was forced to hire lawyers and to go into court to prove her claim; she had to hire attorneys, and the litigation history is staggering; therefore, when I look at all the particular facts in this case, I believe that consequential damages in this sum are justified without a remand to determine the exact amount of the consequential damages, but based upon what is before us now.
Furthermore, in my dissent in this case on the third appeal, I stated:
"Assuming, arguendo, that the insureds did prove their claim for bad faith refusal to pay, I am of the opinion that there is no justification to support an award of punitive damages in the sum of $3,500,000. In Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981), this Court found that a judgment rendered against an insurance company in the amount of $1,100,000 was `excessive and obviously the result of passion and prejudice on the part of the jury.' In Barnes, this Court directed the trial court to require a remittitur in the amount of $1,000,000 as a condition to the denial of a new trial.
"In Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441 (1960), this Court found a jury verdict awarding plaintiff $67,000 was excessive; there, this Court directed a remittitur of all but $45,000 of the judgment as a condition for affirming the judgment."
470 So.2d at 1089.

VI

Conclusion
It would be helpful to me, and I believe to the Court, if the legislative branch would recognize the problem posed by these cases, and would adopt legislation which would be fair to the insured and the insurer, and in the best interest of all the people of the state, so that claims of this kind could be justly, speedily, and inexpensively determined on their merits.
A clear majority of this Court has determined that damages in addition to those normally awarded in contract cases are appropriate in cases such as this one, but have disagreed on the appropriate remedy, and the extent of the damages. Although this Court can, and should, fashion an appropriate remedy for every wrong, and should do so if the legislative branch does not address the wrong, there are some areas where the legislature is uniquely qualified to make those determinations. I believe this is one of them.
Based on the foregoing, I concur in the result reached.
STEAGALL, J., concurs.
HOUSTON, Justice (concurring specially).
I am persuaded by viewing the record in the light most favorable to the Lavoies, which our standard of review requires (Cooper v. Peturis, 384 So.2d 1087 (Ala. 1980)), that the Lavoies' evidence eliminates any arguable reason for Aetna's denial of the claim at the time the claim was denied. Certainly the jury could have found that the claim was denied before Aetna fulfilled the duty it owed its insured to "properly investigate" and subject that investigation to a "cognitive evaluation and review."
I am also persuaded that such a substantial portion of the judgment in this case *1061 was awarded as punitive damages that the judgment violated the Eighth Amendment to the United States Constitution and Article I, Section 15, of the Constitution of Alabama of 1901; and that the lack of sufficient standards governing punitive damages awards in Alabama violates the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, § 6, of the Constitution of Alabama of 1901.
My special concurrence is pragmatic. If this were the first appeal of this case to this Court and if the constitutional challenge had been made to the issue of punitive damages, I would dissent for the reasons hereinafter set out. However, there are two reasons why I concur specially: (1) This Court is not writing on a clean slate in this case, as Justice Maddox's special concurrence shows; and (2) the majority opinion requires the plaintiffs to accept a remittitur of $3 million or to have the case retried, which removes a substantial portion of the punitive damages award.
It is my belief that allowing only punitive damages in death cases, regardless of whether the act or omission causing the death was merely negligent or was willful and wanton, has caused confusion in the law of punitive damages and perhaps has restricted this Court in its efforts to establish meaningful standards for punitive damages in non-death cases.
It is the province of the legislature to determine whether compensatory damages should be permitted in death cases. Trial judges and juries have naturally rebelled at the thought that it may be cheaper to kill a person in Alabama than to injure that person. Wrongful death damages in Alabama have no relation to the economic loss that the family has sustained as a result of a death, because such evidence is inadmissible. Until the legislature changes this, there is no meaningful way for this Court to address the question of punitive damages in wrongful death cases.
However, this should not prevent us from addressing the problem of punitive damages in non-death cases.
In non-death cases, the doctrine of punitive damages survives because it continues to serve the useful purpose of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice. It is a judicial and not a legislative creation.
We have permitted punitive damages to be levied without the constitutional safeguards that we insist attend every criminal prosecution. The purpose for awarding punitive damages, as we have written so often that it needs no citation of authorities, is to punish and deter. We must always remember that punishment is innately related to punitive damages, just as penitence ought to be innately related to a stay in the penitentiary.
The scintilla sufficiency-of-the-evidence rule and the mere-preponderance-of-the-evidence burden of proof are not firm enough foundations for the infliction of punishment.
In most criminal proceedings, a jury determines innocence or guilt; and if the jury finds a defendant guilty, the trial judge imposes the punishment. In doing so, the trial judge is guided by minimum and maximum penalties established by the legislature. He holds a special hearing in which all pertinent information, whether aggravating or mitigating, is reviewed prior to the imposition of the sentence. The trial judge is aware of other sentences for similar offenses and there is a current concern among the judiciary about disparity of sentences.
In awarding punitive damages in a civil case, the jury is given no guidelines and the trial judge is given no guidelines, for we have not promulgated guidelines.
I believe that the judiciary must adopt a principled approach to punitive damages in order to comply with constitutional requirements and to keep from forcing the legislative branch of government to harness this unbridled judicial creation.
I recommend the following procedure as the beginning of a principled approach to punitive damages.
*1062 If the record reasonably supports the inference that the defendant's conduct warrants the imposition of punitive damages (which would be limited to that conduct for which punitive damages may now be awarded), the jury should be instructed to decide whether punitive damages should be awarded and, if the jury answers affirmatively, then the trial judge should set a hearing for the purpose of determining the amount of the punitive damages.
The following should be taken into consideration by the trial court in setting the amount of punitive damages:
(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
(4) The financial position of the defendant would be relevant.
(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.
SHORES, Justice (dissenting).
I adhere to the views expressed in the dissenting opinion which I joined in Aetna Life Insurance Co. v. Lavoie, 470 So.2d 1060 (Ala.1984).
BEATTY, J., concurs.
TORBERT, Chief Justice (on recusal).
Since the original opinion in this case was announced, my daughter has married a member of a law firm representing one of the parties. Canon 3(C)(1)(d)(ii), Alabama Canons of Judicial Ethics, provides that under these circumstances, I should disqualify myself.
NOTES
[*] [Reporter's Note: In the original report of this case at 374 So.2d 310, the plaintiff husband was incorrectly named as "Robert J. Lavoie, Sr." In that report and the report at 405 So.2d 17, the defendant insurer was incorrectly named as "Aetna Life and Casualty Co., Inc."]
[1] On September 29, 1978, insureds (the Lavoies) brought an action against insurer alleging breach of contract and outrageous conduct. The trial court dismissed for failure to state a claim. On appeal, this Court reversed and remanded because it had "not foreclosed the possibility of recovery in tort for the bad faith refusal of an insurer to pay legitimate benefits due under an insurance policy." Lavoie v. Aetna Life & Casualty Co., 374 So.2d 310, 312 (Ala.1979). On remand, the trial court granted insurer's motion for summary judgment on the bad faith claim, and judgment was entered for the insureds on the two statements of the claim based upon contract. This Court again reversed and remanded to the trial court, because, on the same day, we recognized the intentional tort of bad faith in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). Lavoie v. Aetna Life & Casualty Co., 405 So.2d 17, 18 (Ala.1981). On remand, appellees' bad faith claim was submitted to a jury. The jury awarded $3.5 million in punitive damages and $1,650.22 on the contract claim. The trial judge denied appellant's motion for judgment n.o.v. or, alternatively, for a new trial. This Court affirmed. Aetna Life Insurance Co. v. Lavoie, 470 So.2d 1060 (Ala.1984). The insurer appealed to the United States Supreme Court. That Court vacated the decision and remanded to this Court because of its failure to order the recusal of one of the Justices participating in consideration of the case. Aetna Life Insurance Co. v. Lavoie, ___ U.S. ___,106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).
[2] Mrs. Lavoie was insured as a dependent under a group policy of health and medical insurance issued by the appellant, Aetna Life Insurance Company.
[3] This denial occurred after Dr. Douglas wrote a letter to Thomas J. Stein, the Lavoies' attorney at the time, which detailed Mrs. Lavoie's medical problems and his reasons for admitting her for diagnostic tests and treatment. The letter was forwarded to Aetna. Upon receipt of the November 4, 1977, letter from Dr. Douglas, Brenda Harris called Tom Hutton. She noted on the letter Hutton's instruction to "maintain denialif they act like they are going to file suit send back to him." No one from Aetna's medical department was consulted. The nurses' notes and patient's progress notes were not in the Lavoie file.
[4] This denial was made after consultation only with Hutton, even though Harris stated she had "again checked with our Medical Department on this matter." Again, the progress notes and the nurses' notes had not been obtained for the file.
[5] While the nurses' notes and progress notes had finally been included for consideration in the Lavoie file, the two letters from Dr. Douglas were not in the file reviewed by Dr. Swann.
[1] Our own Constitution also prohibits the assessment of "excessive fines." Art. 1, § 15, Constitution of Alabama, 1901. It is not necessary for me to address the constitutional issue to concur in this result here, although there is some authority for the proposition that the Excessive Fines Clause of our state and federal constitutions could be applicable in civil cases and that the precedents flow back to the Magna Charta.

The Supreme Court of the United States has recently reexamined the history of the Eighth Amendment and has examined English antecedents to questions arising under the amendment. Solem v. Helm, 463 U.S. 277, 284-286, 103 S.Ct. 3001, 3006-3007, 77 L.Ed.2d 637 (1983); Ingraham v. Wright, 430 U.S. 651, 664-666, 97 S.Ct. 1401, 1408-1409, 51 L.Ed.2d 711 (1977). One could argue that the historical antecedents to the Excessive Fines Clause support the contention that it should be applied to civil punitive damages awards, and that the Excessive Fines Clause can be traced to the "excessive amercement" provision of Magna Charta, and that "amercements" were additional punishment for defendants in civil cases in 13th-century England. This Court has not ruled on that issue yet. An argument could also be made that the Excessive Fines Clause applies only to criminal cases. One court has so held. See Palmer v. A.H. Robins Co., 684 P.2d 187, 217 (Colo. 1984).