HOUSTON, Justice.
Jack Griffis sued Blue Cross and Blue Shield of Alabama (“Blue Cross”), seeking to recover damages for Blue Cross’s refusal to pay a claim under his medical insurance policy with Blue Cross. Griffis sought to recover under theories of breach of contract and the tort of bad faith refusal to pay an insurance claim. The trial court granted Blue Cross’s motion for a directed verdict on the bad faith claim, but denied Blue Cross’s motion for a directed verdict on the contract claim and submitted that claim to the jury, which returned a verdict for Griffis in the amount of $968.86. The trial court subsequently entered a judgment on that verdict. Griffis appealed that judgment to the Court of Civil Appeals, contending that the trial court had erred in granting Blue Cross’s motion for a directed verdict on his bad faith claim. Blue Cross cross-appealed, arguing that the trial court had erred in submitting the contract claim to the jury. The Court of Civil Appeals held that the trial court had properly submitted the contract claim to the jury, but, characterizing this as an “extraordinary” bad faith case, ruled that the trial court had erroneously directed a verdict for Blue Cross on the bad faith claim. Accordingly, the Court of Civil Appeals affirmed the judgment in part, reversed it in part, and remanded the case for a trial on Griffis’s bad faith claim. See Griffis v. Blue Cross & Blue Shield of Alabama, 590 So.2d 267 (Ala.Civ.App.1991). Both Griffis and Blue Cross sought certiorari review under Rule 39, A.R.APP.P.[1] For the following reasons, we hold that the trial court properly directed a verdict for Blue Cross on the bad faith claim and, therefore, that the judgment of the Court of Civil Appeals pertaining to the bad faith claim is due to be reversed. Furthermore, because of our disposition of Blue Cross’s petition (1900839), we also hold that the issue raised by Griffis’s peti *272 tion (1900854) is moot and, consequently, that the writ in that case is due to be quashed as improvidently granted.
The evidence at trial showed the following: In 1986, Griffis underwent a magnetic resonance imaging scan (“MRI”)[2] for the purpose of staging the progression of cancer of the prostate. The test was prescribed by Dr. Thomas Moody and performed and interpreted by Dr. Robert Naf-tel, a duly qualified diagnostic radiologist. Griffis submitted a claim to Blue Cross for the cost of the MRI. Blue Cross denied coverage, however, based on a provision in Griffis’s policy that excluded benefits for procedures considered by Blue Cross to be “experimental” or “investigative.” That provision, in pertinent part, provides:
“We will not provide benefits for the following, whether or not a physician performs or prescribes them:
[[Image here]]
“12. Any treatment, procedure, facilities, drugs, drug usage, equipment, or supplies which are experimental or investigative.”
The policy defines “experimental” or “investigative” as follows:
“12. ‘Experimental’ or ‘investigative’ means any treatment, procedure, facility, equipment, drugs, drug usage, or supplies either (a) not recognized by us as having scientifically established medical value and [as] being in accordance with generally accepted standards of medical practice or (b) not approved by a governmental agency from which approval is required.”
At the time the MRI was done on Griffis, Blue Cross did not recognize the use of MRIs for diagnosing cancer of the prostate “as having scientifically established medical value and [as] being in accordance with generally accepted standards of medical practice.” The use of MRIs for diagnosing conditions of the brain, spine, and limbs, however, was recognized by Blue Cross. Dr. Patrick Ryce,[3] director of Blue Cross’s medical department, testified that it was his decision to place MRIs of the prostate on the company’s list of “experimental” or “investigative” procedures and that his decision was based on information that he had received in consultations with Blue Cross’s medical review committee, which consisted of practicing physicians who were not employed by Blue Cross,[4] as well as on information that he had received from practicing radiologists who were experts in their field and had had hands-on experience with MRIs.[5] Dr. Ryce also testified that he had reviewed various medical journals regarding new treatments and tests[6] and that he had considered the recommendation *273 of the National Blue Cross and Blue Shield Association, a central organization that reviews new medical procedures and disseminates information to the approximately 78 Blue Cross and Blue Shield plans throughout the country. Dr. Ryce explained that Blue Cross’s list of “experimental” or “investigative” procedures was reevaluated continuously and that the list was revised approximately every six to eight weeks to reflect the technological advances that had been made in various procedures.
Dr. Naftel, testifying on behalf of Grif-fis, stated that he performed the MRI on Griffis for the purpose of discovering whether there had been any local progression of the cancer into the fat around the prostate gland or any metastasis into the pelvic region or into the lymph nodes. He testified that the staging of the disease would, in turn, affect the course of treatment. Dr. Naftel testified further that, in his opinion, the MRI used in evaluating Griffis’s condition was the safest and most effective method of obtaining the information sought and that it was superior to other existing means by which the information could be obtained. In addition, Dr. Naftel testified that he first began using MRIs in 1985 or 1986, principally to diagnose conditions of the brain and spine. He described his use of MRIs as being on the “cutting edge” of medicine in 1986 and he stated that the group with which he was associated was one of the first in the southeast to acquire an MRI machine and that that machine was “probably one of the first ten or fifteen in the country.” Dr. Naftel conceded that he had not conducted any studies or experiments to determine the effectiveness of MRIs in diagnosing prostate cancer. Dr. Naftel further conceded that in 1986 there was room for disagreement among medical professionals as to the effectiveness of MRIs. He testified as follows:
“Q. And in your case, I guess, with use of the MRI, it is, ... in your opinion, proven to be useful and effective; is that correct?
“A. That’s correct.
“Q. Now, back in 1985 or 1986 when it first came out, there was still some doubt about that; is that true?
“A. Well, I think in the general community, yes; in the general medical community.”
Dr. Moody, also testifying for Griffis, stated that the MRI, in conjunction with other diagnostic tests performed, enabled him to determine the proper treatment for Griffis and that he determined that Griffis would benefit from a radical prostatecto-my — the removal of the entire prostate gland. Dr. Moody testified further that the MRI had helped him determine that Griffis’s cancer was at a “potentially curable stage.”[7]
Arguing that it had a legitimate or debatable reason for concluding in 1986 that MRIs of the prostate were “experimental” or “investigative,” as those terms are de *274 fined in the policy, and, thus, that it had a reasonable basis upon which to deny coverage, Blue Cross contends that the trial court properly directed a verdict in its favor on Griffis’s bad faith claim. The thrust of Blue Cross’s contention is that this is an “ordinary” bad faith case in which Griffis was not entitled to a directed verdict on his contract claim and, therefore, that the “directed verdict on the contract claim standard,” as discussed in National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), was properly applied by the trial court in directing a verdict in its favor on the bad faith claim. However, Griffis contends, and the Court of Civil Appeals agreed, that this case does not fall within the category of an “ordinary” bad faith case. Rather, he argues, and the Court of Civil Appeals held, that this is an “extraordinary” bad faith case where the “directed verdict on the contract claim standard” should not have been applied by the trial court. Accordingly, because the evidence clearly shows that Griffis was not entitled to a directed verdict on his contract claim, the dispositive issue is whether the Court of Civil Appeals correctly categorized this case as an “extraordinary” bad faith case, as opposed to an “ordinary" bad faith case, so as to warrant submitting the bad faith claim to a jury.
The Court of Civil Appeals cited no cases in support of its holding that this is an “extraordinary” bad faith case and therefore is not subject to the “directed verdict on the contract claim standard.” In Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990), this Court, holding that the case fell into the “extraordinary” category of bad faith cases, reviewed the history of the development of the tort of bad faith and discussed in depth the kinds of bad faith cases that have been categorized as “extraordinary:”
“Following the decisions in Chavers [v. National Security Fire Ins. Co., 405 So.2d 1 (Ala.1981)], [Gulf Atlantic Life Ins. Co. v.] Barnes, [405 So.2d 916 (Ala.1981)], and [National Security Fire & Cas. Co. v.] Bowen, [417 So.2d 179 (Ala.1982)], this Court established what is now known as the ‘directed verdict on the contract claim standard’ in bad faith cases. See Burkett v. Burkett, 542 So.2d 1215, 1218 (Ala.1989). Writing for the Court in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982), Justice Shores stated:
“ ‘As noted by both sides in this case, the tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases. In [National Security Fire & Cas. Co. v. Bowen], we set out the elements of the tort and attempted to show the plaintiff’s burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.’
“The Dutton Court’s characterization of a plaintiff’s burden of proof as a ‘heavy’ one was no doubt prompted by the Court’s previous recognition in Chavers of the necessity for allowing insurers a broad range of freedom to thoroughly evaluate claims and to decline payment in nonmeritorious cases. However, keenly aware of the fact that there were countervailing policy considerations that weighed in favor of an insured’s right to have his claim properly evaluated and promptly paid by the insurer, the Dutton Court, in articulating the standard to be applied in ‘normal’ or ‘ordinary’ bad faith cases, allowed for a different standard to be applied-in certain unusual or extraordinary cases. Justice Jones, concurring specially in Dutton, elaborated on the majority’s opinion:
*275 “ ‘I concur completely with the opinion and write separately to elaborate on one point. The opinion correctly prefaces the “directed verdict on the contract claim” standard with the words “In the normal case”; and the phrase “if the evidence produced ... creates a fact issue ...” is preceded by the word “Ordinarily.” These are significant qualifications. Certainly, extreme cases will arise in which a fact issue will present a jury question on that claim. This is not the case before us; and, absent such circumstances, the “directed verdict on the contract claim” is the applicable standard for testing the tort of bad faith claim.’ “Later, Justice Jones, in his opinion concurring specially in Safeco Insurance Co. of America v. Sims, 435 So.2d 1219, 1224 (Ala.1983), wrote:
“ ‘This “directed verdict on the contract claim” test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff’s motion for a directed verdict on the contract. Indeed, the words “entitled to a directed verdict” so indicate. Rather, this test is intended as an objective standard by which to measure plaintiff’s compliance with his burden of proving that defendant’s denial of payment was without any reasonable basis either in fact or law; i.e., that defendant’s defense to the contract claim is devoid of any triable issue of fact or reasonably arguable question of law.
“ ‘Exceptions to the “directed verdict” rule will undoubtedly arise. Take the case where the insurer insists that its refusal of payment was grounded solely on a particular entry in a hospital record, and plaintiff denies the very existence of such an entry. Merely because the insurer may be able to withstand a directed verdict motion — the existence vel non of the record entry itself being an issue of fact — would not, as a matter of law, bar the plaintiff’s tort claim. This extreme example is to be distinguished from the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from a hospital record entry. If the entry in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.
“ ‘Because of its potential relevance, one additional exception to the “directed verdict” test is suggested: Take the case of the insurer whose refusal of payment is based solely upon a legal position with respect to the controlling principles of law and its application to the undisputed facts giving rise to the claim. While the insurer, under the guise of asserting a legitimate defense, could not be heard to take issue with clear, well settled, elementary principles of contract law, certainly the rule of reasonableness dictates a field of operation for a denial of benefits based upon arguable legal grounds which are fairly debatable, even though the trial judge may correctly reject such arguments and direct a verdict for the insured.
“ ‘Thus, as we have seen, Dutton’s use of the terms “In the normal case” and “Ordinarily” allows for exceptions to the “entitled to a directed verdict” test. In the first example, the insured may proceed with his bad faith claim even though he was not entitled to a directed verdict; and in the second example, the insurer would be entitled to a judgment on the tort claim even though the insured was entitled to a directed verdict on the contract claim. Certainly these rare exceptions will not be difficult to recognize, nor will the general rule, because of rare excep *276 tions, be difficult to apply.’ ” (Emphasis in original.)
“Indeed, this Court was later confronted with cases in which the 'directed verdict on the contract claim standard’ was deemed inapplicable and the insurers were not permitted to avoid bad faith liability by putting on evidence sufficient to defeat the plaintiffs’ motions for a directed verdict on the contract claims. In Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984), this Court stated that even if the plaintiff had not been entitled to a directed verdict on the contract claim, the bad faith claim would have been properly submitted to the jury. The Court in Kountz determined from the evidence presented at trial that the insurer intentionally failed to investigate the claim sufficiently to determine the existence of a valid reason for denying payment (i.e., the insurer failed to determine that the reason for the removal of the plaintiff’s teeth was an injury, as claimed, not the pre-existing chronic periodontal disease). See, also, Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987). In both Kountz and Aetna, the Court, quoting Gulf Atlantic Life Ins. Co. v. Barnes, supra, recognized that an intentional failure on the part of an insurer to determine whether there was a lawful basis for denying a claim could be established with proof that the insurer either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review. In Aetna, the Court stated: ‘Considering the fact that the decision to deny [the claim] was made without the benefit of “critical” sections of the medical file, the jury could find that the claim was not “properly investigated,” and that there was a “reckless indifference to facts or to proof.” ’ 505 So.2d at 1053. See, also, Blue Cross & Blue Shield of Alabama v. Granger, 461 So.2d 1320 (Ala.1984), and Carter v. Old American Ins. Co., 544 So.2d 917 (Ala.1989).
“In Jones v. Alabama Farm Bureau Mutual Casualty Co., 507 So.2d 396 (Ala.1987), the [plaintiff] had a homeowner’s policy that insured against damage caused directly by perils such as lightning, but not against damage caused indirectly, such as from a tree falling on the power line. During a storm the [plaintiff] experienced problems with [her] electrical service, and several items of personal property were damaged. The [plaintiff] and Alabama Farm Bureau Mutual Casualty Company ('Farm Bureau’) disputed whether the damage was caused directly by a lightning strike or by a power surge when a tree limb fell on the power line. A Farm Bureau adjuster claimed that the [plaintiff’s husband] told him that the damage resulted when a tree limb fell on the power line. The adjuster’s decision was based solely on what the [plaintiff’s husband] allegedly had told him. Farm Bureau argued that the factual dispute as to what the [plaintiff’s husband] had told the adjuster in the conversation precluded a directed verdict in favor of the plaintiff in the breach of contract action, and, therefore, under Dutton entitled Farm Bureau to a summary judgment on the bad faith claim. However, we held:
“ ‘The instant case is not the normal or ordinary case. As stated previously, the sole basis for the initial denial of Mrs. Jones's claim by Mr. Kratzer was Mr. Jones’s alleged statement to Kratzer. It is the resolution of this factual issue, alone, that will determine the viability of Mrs. Jones’s bad faith claim. Clearly, if Mr. Jones told Mr. Kratzer that lightning struck the house and that a tree limb fell on the service entrance line shortly thereafter, and that the damage to the service entrance line was the cause of the damage to the personal property, then Kratzer could have an arguable reason for summarily denying coverage. On the other hand, if Mr. Jones told Mr. Kratzer that he believed that the damage was caused by lightning, Mr. Krat-zer would be under a duty to determine whether there was, in fact, any lawful basis for the denial of the claim. A simple examination of the personal *277 property to determine the cause of damage would be sufficient.
“ ‘Although the plaintiff’s burden of proof in a bad faith action is great, it should not be insurmountable. Precluding a plaintiffs bad faith action by application of the “directed verdict on the contract claim” test when the disputed factual issue arises solely from a contradicted oral conversation between the insurer and the insured or a third person puts too onerous a burden on the plaintiff. Moreover, it would frustrate the purpose of the bad faith action by allowing an insurer simply to misrepresent the content of an oral conversation to avoid liability.’ ” 507 So.2d at 400-01.
“In United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala.1989), the insurer failed to pay the insured’s claim under a ‘Medicare supplement’ policy that read as follows:
“ ‘[I]f you have not established entitlement to hospital and/or medical insurance benefits under Medicare, we will pay the benefits provided under this policy as though you had established entitlement.’
“The insured, who was 64 years old, was not covered by Medicare at the time he submitted his claim. This Court held that the bad faith claim had been properly submitted to the jury, stating, in pertinent part, as follows:
“ ‘United American substantially asserts that it did not receive until June 7, 1985, the bills or letters or calls from Mr. Brumley or Hill or Green. “Although the plaintiff’s burden in a bad faith action is great, it should not be insurmountable.” [Jones v. Alabama Farm Bureau Mutual Casualty Co.] at 401. To preclude Mr. Brum-ley’s bad faith action by application of the “directed verdict on the contract” requirement, when the allegedly disputed factual issues arise solely from the statements of United American, would put too onerous a burden on Mr. Brumley. The policy noted in Jones is present here: it would frustrate the purpose of the bad faith action to allow an insurer to prevent a bad faith claim from going to the jury by feigning ignorance of the claim or misrepresenting the content of oral or written communications. Accordingly, we hold that the trial court did not violate the “directed verdict on the contract” requirement of bad faith claims by submitting the bad faith claim to the jury. Indeed, a directed verdict on the contract claim might well have been appropriate under these facts, but we need not reach that question.’
“542 So.2d at 1235-36.”
566 So.2d at 742-45.
After carefully reviewing the record, we conclude that this is not an “extraordinary” bad faith case. This case is distinguishable from Continental Assurance Co. v. Kountz, supra (involving a fact question as to whether the insurer had intentionally failed to sufficiently investigate the claim); Aetna Life Insurance Co. v. Lavoie, supra (involving a fact question as to whether the insurer had intentionally failed to sufficiently investigate the claim); Jones v. Alabama Farm Bureau Mutual Casualty Co., supra (involving a disputed conversation between an insurance adjuster and the plaintiff's husband that precluded a directed verdict for the plaintiff on her contract claim and created a fact question as to whether the insurer had intentionally failed to sufficiently investigate the claim); United American Insurance Co. v. Brumley, supra (involving a factual dispute between the plaintiff and the insurer as to whether the insurer had received notice of the claim and, thus, as to whether the insurer had intentionally failed to sufficiently investigate the claim); and Thomas v. Principal Financial Group, supra (involving a factual dispute concerning the intent of the policy that formed the basis for the insurer’s alleged lawful denial of the claim, and, thus, a fact question as to whether the insurer had intentionally failed to sufficiently investigate the claim). In all those cases this Court held that the “directed verdict on the contract claim standard” was inapplicable. In those cases, we held that it would have placed too great a burden on *278 the plaintiffs and, thus, that it would have frustrated the purpose of the bad faith action, to allow the insurers to avoid bad faith liability by putting on evidence sufficient to defeat the plaintiffs’ motions for directed verdict on the contract claims. In the present case, however, we have what then Justice Jones characterized in his special concurrence in Safeco Insurance Company of America v. Sims, supra, as “the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from” objective information. 435 So.2d at 1224. Justice Jones went on to state the rule that is applicable in the present case:
“If [objective information] in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.”
435 So.2d at 1224.
The evidence is undisputed that, at the time Griffis’s claim was denied, Blue Cross’s list of “experimental” or “investigative” procedures was based on information that it had received from reputable sources within the medical community. Blue Cross continuously reevaluated its list and revised it approximately every six to eight weeks. There was no evidence that Blue Cross acted unreasonably in denying Griffis’s claim based on the information before it in 1986, which indicated that the use of MRIs as a tool for diagnosing prostate cancer was not recognized within the medical community “as having scientifically established medical value and [as] being in accordance with generally accepted standards of medical practice.”
As previously stated, that portion of the judgment of the Court of Civil Appeals pertaining to Griffis’s bad faith claim is due to be reversed and the case remanded. Griffis argues in support of his petition for writ of certiorari that the jury, in finding in his favor on the contract claim, also found the presence of all elements necessary to establish liability under his bad faith claim; therefore, he contends, the Court of Civil Appeals should have remanded the case for a trial on the damages issue only. Griffis’s argument is based on the manner in which the jury was instructed on the contract claim. The jury was told that in order to find for Griffis on his contract claim, which, as we have previously stated (see note 1), is not before us for review, it had to find that Blue Cross was guilty of conscious wrongdoing (i.e., that the denial of Griffis’s insurance claim was the result of an arbitrary decision on Blue Cross’s part). However, as previously noted, because our disposition of Blue Cross’s petition has rendered the issue raised by Griffis’s petition moot, the writ issued in 1900854 is due to be quashed as improvidently granted.
1900839 REVERSED AND REMANDED.
1900854 WRIT QUASHED AS IMPROVIDENTLY GRANTED.
HORNSBY, C.J., and MADDOX and STEAGALL, JJ., concur.
ALMON and KENNEDY, JJ., concur in the result.

. Blue Cross petitioned for review only as to the ruling on the bad faith claim. The propriety of the ruling on the contract claim is not before us.

. Magnetic resonance imaging is a procedure used to view the inside of the human body, but in a manner different from other procedures, such as the standard X-ray.

. Dr. Ryce graduated from the Louisiana State University School of Medicine in 1974; completed an internship in internal medicine at the University of Alabama in Birmingham (UAB), Cooper Green Hospital, and the Veterans' Administration Hospital; completed a two-year residency in internal medicine at UAB; served one year as an instructor and as the chief medical resident at UAB; is board certified in internal medicine; has practiced medicine privately; became Blue Cross’s medical director in 1986; and is a member of various medical associations.

. Blue Cross’s medical review committee consisted of Dr. William Webb, a surgeon and gas-troenterologist in Opelika; Dr. Mack Otts, an obstetrician and gynecologist in Mobile; Dr. Henry Hodo, a retired general surgeon; Dr. Dick Briggs, an internist in Birmingham, specializing in lung disorders; and Dr. Mack Porter, an internist and heart specialist in Montgomery.

. Among these physicians were Dr. Ralph Doughton, senior radiologist at St. Vincent’s Hospital in Birmingham and an expert in MRIs; Dr. Hungerford in Mobile; Dr. Howard Holly of Tuscaloosa; and Dr. Sekar in Birmingham, an expert in MRI of the brain.

. Blue Cross submitted a January 1986 article published in a radiology journal entitled "Pros-tatic Carcinoma and Benign Prostatic Hyperpla-sia: Inability of MR Imaging to Distinguish Between the Two Diseases.” Dr. Ryce testified that the article reported on the existing controversy within the medical community as to whether MRIs were capable of differentiating between malignant and benign conditions of the prostate. Blue Cross also submitted a 1985 article from that same journal that, according to Dr. Ryce, also reflected the controversy within the medical community regarding the effectiveness of MRIs in diagnosing prostate cancer.

. Griffis also submitted into evidence a letter from Dr. Moody to Blue Cross, in which Dr. Moody wrote that the MRI he had done on Griffis was consistent with “good medical care.” He also stated in the letter that the MRI had become a “standard method to evaluate the prostate and pelvic lymphnoid areas.” The record indicates, however, that this letter was the subject of a motion in limine filed by Blue Cross and that the letter was admitted into evidence for the limited purpose of showing that Blue Cross had been given notice of Griffis’s claim. The Court of Civil Appeals cited this letter as substantive evidence of the effectiveness of MRIs in 1986 in diagnosing prostate cancer. However, as Blue Cross points out, Dr. Moody admitted that he actually had no opinion, and no basis upon which to form an opinion, at the time he wrote the letter, as to the effectiveness of MRIs. Dr. Moody testified that the statements in his letter were based solely on an opinion that had been expressed by Dr. Naf-tel. Under these circumstances, the Court of Civil Appeals erred in citing Dr. Moody's letter as evidence of the effectiveness of MRIs in diagnosing prostate cancer in 1986. See Salotti v. Seaboard Coastline R.R., 293 Ala. 1, 299 So.2d 695 (1974), holding modified, Nash v. Cosby, 574 So.2d 700 (Ala.1990). We note that the present case was tried in 1989, prior to this Court’s decision in Nash v. Cosby, in which the well-established rule discussed in Salotti was modified. Nash has no application here. See City of Birmingham v. Blount County, 533 So.2d 534 (Ala.1988); State v. Morrison Cafeterias Consolidated, Inc., 487 So.2d 898 (Ala.1986) (generally, a judicial decision affecting a well-established rule of long standing will not be given retrospective application).