566 So.2d 735 (1990)
Barbara Caroline THOMAS
v.
PRINCIPAL FINANCIAL GROUP, a/k/a or d/b/a Principal Mutual Life Insurance Company, a corporation.
PRINCIPAL MUTUAL LIFE INSURANCE COMPANY
v.
Barbara Caroline THOMAS.
88-834, 88-925.
Supreme Court of Alabama.
August 3, 1990.
*736 John T. Crowder, Jr. and Andrew T. Citrin of Cunningham, Bounds, Yance, Crowder and Brown and Mary Beth Mantiply, Mobile, for appellant/cross-appellee.
Forrest S. Latta and Lynn Etheridge Hare of Barker & Janecky, Birmingham, for appellee/cross-appellant.
HOUSTON, Justice.
Barbara Caroline Thomas sued Principal Financial Group, d/b/a Principal Mutual Life Insurance Company ("Principal Mutual"), seeking damages for breach of contract and bad faith refusal to pay insurance benefits. At trial, Ms. Thomas's motion for a directed verdict on the contract claim and Principal Mutual's motion for a directed verdict on both claims were denied and the case was submitted to a jury, which awarded Ms. Thomas $1,000 on her breach of contract claim and $750,000 on her bad faith claim. The trial court entered a judgment on that verdict. Principal Mutual moved for a judgment notwithstanding the verdict on both claims or, in the alternative, a new trial. The trial court entered for Principal Mutual a judgment notwithstanding the verdict on the bad faith claim, but left intact the judgment for Ms. Thomas on the contract claim. Ms. Thomas appealed from the judgment for Principal Mutual on the bad faith claim, and Principal Mutual cross-appealed from the judgment for Ms. Thomas on the contract claim. We affirm the judgment for Ms. Thomas on the contract claim; we reverse the judgment for Principal Mutual on the bad faith claim and remand the case with directions.
The University of South Alabama Medical Center ("the University") contracted with Principal Mutual for group life insurance for its employees and their dependent children. The policy reads, in pertinent part, as follows:
"The word `Dependent' means only a Person's spouse and each unmarried child eight days but less than nineteen years of age, provided such individual is not eligible under this Policy for Personal Insurance as hereinafter defined and is not in the Armed Forces of any country. In addition to any natural born child of the Person, the word `child' includes any legally adopted child; or stepchild or foster child who resides in the Person's household and is dependent upon such Person for his principal support and maintenance. The word `Dependent' shall also mean each unmarried child who is nineteen years but less than twenty-five years of age provided he is attending school on a full-time basis and is dependent upon the Person for his principal support and maintenance. School vacation periods during any calendar year which interrupt but do not terminate what otherwise would have been a continuous course of study in that calendar year shall be considered a part of school attendance on a full-time basis." (Emphasis added.)
Ms. Thomas, an employee of the University, had a daughter, Melinda Warren, who in July 1984 had enrolled in a 1200-hour work-study course in cosmetology at the Mobile Academy of Hair Design ("Mobile Academy"), when she was 21 years old. The course was not taught on a quarter or semester basis, but, instead, on a continuous basis until a degree was earned. After paying full tuition and after attending classes for a period of time, Ms. Warren became disabled and could not attend school after August 1985 due to ovarian cancer; she died of ovarian cancer in March 1987, at the age of 24. At the time of her death, Ms. Warren was unmarried and was dependent upon her mother for her principal support and maintenance. With the help of Janice Rehm, a representative of the University's personnel department, Ms. Thomas filed a claim with Principal Mutual for the $1,000 life insurance benefit that was payable for the death of a "dependent." JoAnn Robbins, a claims examiner with Principal Mutual, contacted *737 Ms. Rehm and inquired as to whether Ms. Warren was "attending school on a fulltime basis" at the time of her death. Ms. Rehm contacted Ms. Thomas and Betty Jo Tanner, the owner of the Mobile Academy. Ms. Rehm relayed the information that she received from Ms. Thomas and Ms. Tanner to Ms. Robbins, who made the following notation in the claim file:
"4/24/87 Last on roll at school thru [sic] 9/85. Last year & 10 mos. in & out of hosp(imp) 30 times. Also went on chemo-(op trmts). Last 6 mos before deathShe was completely bedridden.
 "Attended
 Mobile Academy of Hair Design
 4467 Old Shell Road
 Mobile, AL 36608
 "Cosmetology College
 Jo TannerDirector
 (205) 344-0685
"Only reason she wasn't in school beyond 9/85 was because she was sick."
In accordance with company procedure, Ms. Robbins prepared an evaluation sheet on Ms. Thomas's claim and sent it to her supervisor, Pam Davis, recommending that the claim be denied:
"Melinda Warren was attending school on a full-time basis through 9/85 and was enrolled in the Mobile Academy of hair design. The contract provides that an unmarried child between the ages of 19 and 25 who is attending school on a full-time basis is a dependent. For the last year and 10 mos Melinda was disabled due to cancer. The contract also provides that dependent coverage will cease when an individual ceases to be a dependent as defined in Section 17. Feel we should decline benefits."
Ms. Davis approved that recommendation and made the following notation on the evaluation sheet:
"Agreewas not an eligible dependent @ time of death."
The evaluation sheet was then forwarded by Ms. Davis to her supervisor, Mike Wallace, for a final determination as to whether the claim would be paid. Wallace decided to deny the claim and he wrote "agree" on the evaluation sheet. Thereafter, Ms. Robbins wrote a letter to Ted Ferguson, the personnel director at the University, stating in part:
"According to the information we have received from your office, Melinda Warren was last on the role [sic] at school through September, 1985. She then became disabled and died on March 10, 1987. From September, 1985, through her demise she was not attending school on a full-time basis. Therefore, effective September, 1985, she would not meet the definition of a dependent as defined in the group policy and would not be eligible for dependent life insurance. Since she was not considered a dependent at the time of her demise, dependent life insurance benefits are not payable on this claim."
Ms. Thomas and her attorney wrote letters to Ms. Robbins, requesting that Principal Mutual reconsider its denial of her claim. Upon receipt of these letters, Ms. Robbins conducted a second review of the claim and prepared a second evaluation sheet, upon which she noted:
"The insured is asking for reconsideration of our denial of this claim. Please review attorney's letter dated 6/23/87. I have reviewed the contract and feel our decision was correct. Feel we should write [insured] w/cc [carbon copy] to GPH [group policy holder] & atty, and reconfirm our denial. Do you have further recommendations?"
This evaluation sheet was then sent to Ms. Davis, who wrote "agree" on it. The claim was then reviewed jointly by Nancy Ford, another claims examiner, and Merle Kaplan, the senior claims consultant. Kaplan made the following notation on the evaluation sheet:
"Reviewed with Nancy Ford. No contractual basis for continuance of coverage to the date of death. Respond to attornies [sic] letter citing contractual basis for denial."
Thereafter, Ms. Davis wrote a letter to Ms. Thomas's attorney stating that Principal Mutual's initial decision to deny the claim would stand. Upon receipt of this letter, Ms. Thomas filed suit.

*738 Breach of Contract

Principal Mutual contends that the trial court erred in denying its motions for a directed verdict and judgment notwithstanding the verdict on the contract claim because, it argues, there was no fact question for resolution by the jury. Principal Mutual maintains that the policy clearly provided that the $1,000 benefit was payable to Ms. Thomas only if her daughter was a "dependent" at the time of her death; that to be a "dependent," Ms. Warren had to be "attending school on a fulltime basis"; that the undisputed evidence showed that she had not been enrolled in, nor attending, school for approximately 18 months immediately preceding her death; and, therefore, that Ms. Thomas could not recover under the policy.
Ms. Thomas argues, on the other hand, that the words "attending school on a fulltime basis" are ambiguous; that the undisputed evidence showed that Ms. Warren was enrolled in the Mobile Academy at the time of her death and was "attending school on a full-time basis" within the meaning of the policy, even though she had not attended classes for approximately 18 months immediately preceding her death; and, therefore, that the trial court did not err in denying Principal Mutual's motions for a directed verdict and judgment notwithstanding the verdict. The thrust of Ms. Thomas's argument is that she, not Principal Mutual, was actually entitled to a directed verdict on the contract claim. This argument is based upon her claim that Ms. Warren did not lose her status as a "dependent" under the policy because of the fact that the illness that eventually led to her death rendered her physically incapable of attending school prior to her death. Ms. Thomas argues strenuously that the evidence showed that under the circumstances of this case Principal Mutual contemplated that payment would be made. For the following reasons, we hold that a fact question was presented as to whether Ms. Warren was a "dependent" within the meaning of the policy at the time of her death.
This action was not pending on June 11, 1987; therefore, the applicable standard of review is the "substantial evidence rule." Ala.Code 1975, § 12-21-12. Thus, Principal Mutual would have been entitled to a judgment as a matter of law if, viewing the evidence in a light most favorable to Ms. Thomas, Ms. Thomas failed to present substantial evidence that Ms. Warren was a "dependent" within the meaning of the policy at the time of her death. Watters v. Lawrence County, 551 So.2d 1011 (Ala. 1989). "Substantial evidence" has been defined by the Legislature as "evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven." § 12-21-12. In West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), this Court, construing § 12-21-12, stated that "substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."
The trial court correctly concluded as a matter of law that, under certain clear language of the policy, Ms. Warren's status as a "dependent" was to be determined as of the date of her death. Alpine Constr. Co. v. Water Works Bd. of the City of Birmingham, 377 So.2d 954, 956 (Ala.1979) ("[t]here is scarcely a rule more firmly established than that the court, not the jury, will interpret the meaning of a contract, whether oral or written, unless the court determines the contract to be ambiguous and one of the parties makes an offer of proof as to surrounding facts and circumstances which would clarify the contract's meaning, in which case it is within the province of the jury to ascertain those facts and draw such inferences from them as are necessary to the interpretation of the contract, upon proper instructions by the court"). The trial court concluded, however, that the words "attending school on a full-time basis" were ambiguous under the circumstances, and it instructed the jury to determine whether Ms. Warren was a "dependent" within the meaning of the policy at the time of her death.
*739 The words "attending school on a fulltime basis" are not patently ambiguous; that is, on their face they are clear and intelligible and suggest but a single meaning. "Attending" is the present participle of "attend." "Attend" is defined in The American Heritage Dictionary of the English Language (1969) as "to be present at: attend class." "Full-time," used in the policy as an adjective, is defined in The Random House Dictionary of the English Language (1971) as "working or operating the customary number of hours in each day, week, or month." Thus, the words "attending school on a full-time basis," at least on their face, envision presence in school for the normal or standard period of time required. If this were the end of our inquiry, we would be compelled to hold the trial court in error for denying Principal Mutual's motions for a directed verdict and judgment notwithstanding the verdict, because the undisputed evidence showed that Ms. Warren was not attending school at the Mobile Academy at the time of her death and had not been doing so for approximately 18 months prior thereto. However, if all of the evidence is considered and viewed in a light most favorable to Ms. Thomas, as it must be in this case, it is apparent that the policy language does suffer from a latent ambiguity. An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings. Black's Law Dictionary (5th ed. 1979) (defining "ambiguity"); Medical Clinic Bd. of the City of Birmingham-Crestwood v. Smelley, 408 So.2d 1203 (Ala.1981).
The record in the present case reveals that the policy in question was a life insurance policy that was payable upon the death of a "dependent," whether death was the result of an accident or of an illness; that each claim submitted to Principal Mutual was reviewed on a case-by-case basis; that policy language was not always interpreted literally; that a manual used by Principal Mutual's claims examiners stated: "All policy provisions shall be interpreted in accordance with the common understanding of their language. The spirit or intent of the provision as distinguished from a narrow interpretation of the language shall be given effect"; that Edward Kahalley, Jr., an insurance consultant and administrator with over 20 years of experience in interpreting group insurance policies, and with knowledge of the practices and customs of the insurance industry, gave undisputed testimony as an expert that Ms. Warren would have been considered a "dependent" within the meaning of the policy by all other insurers within the industry because she was rendered physically incapable of attending school by a debilitating illness that eventually caused her death;[1] that there was a conflict in the *740 evidence as to whether Ms. Warren was enrolled in the Mobile Academy at the time of her death; and that at least two of Principal Mutual's claims examiners, Ms. Robbins and Mr. Wallace, seemed confused as to exactly what the policy language meant. Although Ms. Davis and Mr. Kaplan appear to have steadfastly maintained that the policy language did not contemplate that a person in Ms. Warren's position would be considered a "dependent" within the meaning of the policy, as previously shown, there was substantial evidence that it did contemplate that. We hold, therefore, that the trial court did not err in allowing the jury to determine whether Ms. Warren was "attending school on a full-time basis" and, thus, whether she was a "dependent" at the time of her death. Alpine Constr. Co. v. Water Works Bd. of the City of Birmingham, supra.

Bad Faith
Ms. Thomas contends that the trial court erred in entering a judgment for Principal Mutual notwithstanding the verdict on her bad faith claim. She argues that a fact question was presented as to whether Principal Mutual was guilty of bad faith in denying her claim. Principal Mutual, on the other hand, argues that there was no fact question to be resolved by the jury and, therefore, that the trial court did not err in entering a judgment for it as a matter of law.
This Court first recognized an actionable tort for an insurer's intentional refusal to pay a claim in Chavers v. National Security Fire & Cas. Co., 405 So.2d 1 (Ala.1981). The Chavers Court held that there was an implied-in-law duty of good faith and fair dealing in contractual relationships between insurers and their insureds. Bad faith was defined as "the intentional failure by the insurer to perform this duty implied in law." 405 So.2d at 5. The Court went on to hold:
"[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either `(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'"
405 So.2d at 7. Accordingly, a two-tiered test was established by which to determine whether an insurer had acted in bad faith in refusing to pay a claim. In recognizing the new tort, the Court in Chavers explained that the policy considerations underlying the disallowance of a negligence standard of conduct in actions by insureds against their insurers did not proscribe a cause of action arising out of intentional misconduct by insurers:
"We hold that the same policy considerations underlying the disallowance of a negligence standard of conduct in this context do not categorically proscribe a cause of action arising out of intentional misconduct by the insurer. To hold otherwise would render meaningless the long standing legal principle in this state which holds that every contract carries with it an implied in law duty of good faith and fair dealing. See World's Exposition Shows, Inc. v. B.P.O. Elks, No. *741 148, 237 Ala. 329, 186 So. 721 (1939). While freedom of contract must necessarily be preserved, the corresponding duty of good faith and fair dealing must similarly be preserved as an integral part of contractual relations. As Justice Jones reasoned in his special concurrence in [Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054 (Ala.1979)], this good faith duty imposed not by the contract itself, but rather by law, should not be premised upon a negligence standard of conduct.
"`The reasonable expectations of parties to an insurance contract contemplate a broad range of freedom on the part of the insurer to evaluate claims submitted thereunder and to decline payment in nonmeritorious cases. The corresponding duty to use diligence in the review and prompt payment of meritorious claims is contractually bargained for and the law need not impose a further duty to enforce its negligent breach. Similarly, this freedom (and, perhaps, the duty) not to honor, and thus legally dispute, claims of questionable validity in accordance with the terms of the contract is effectively denied if the law imposes so high a duty of faithful performance as to pose a threat of increased risks in the event the dispute is ultimately resolved adversely to the insurer.
"`These public policy considerations, however, do not persuade me that the law imposes no duty of good faith performance.'

"Vincent v. Blue Cross-Blue Shield of Alabama. (Emphasis added.)
"The dissent in Vincent, set out in pertinent part below, further reflects the inherent policy considerations mandating our recognition of a redressable tort for intentional breach of good faith.
"`Public policy favors the free exercise of rights arising from a contract by the parties to it.
"`However, this is not to say that an insurer may in bad faith breach his contract with impunity. The law will not allow an insurer to wilfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need.'"
405 So.2d at 6.
The Chavers test was refined and clarified in Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981):
"The first tier of the test promulgated by Mr. Justice Embry and adopted by this Court in Chavers establishes that the tort of bad faith refusal to honor a direct claim arises when there exists `no lawful basis for the refusal coupled with actual knowledge of that fact.' `No lawful basis,' as expressed in that opinion, means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. See Michael v. National Security Fire & Casualty Co., 458 F.Supp. 128 (N.D.Miss.1978). That is, when the claim is not fairly debatable, refusal to pay will be bad faith and, under appropriate facts, give rise to an action for tortious refusal to honor the claim. Anderson v. Continental Insurance Co., 85 Wis.2d 675, 271 N.W.2d 368 (1978). When a claim is `fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. `Coupled with actual knowledge of that fact' implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.
"The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an `intentional failure to determine whether or not there was any lawful basis for refusal,' may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate *742 or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured. Of course, if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith. Otherwise, the insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact, i.e., the jury."
Gulf Atlantic's instructions evidence this Court's initial concern that the existence vel non of bad faith must not be determined in a vacuum, but under the circumstances existing at the time the insurer denied the claim.
The elements of a bad faith claim were summarized in National Security Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982), as follows:
"An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. Chavers v. National Security Fire Ins. Co., Ala., 405 So.2d 1 (1981). No lawful basis `means that the insurer lacks a legitimate or arguable reason for failing to pay the claim.' Gulf Atlantic Life Ins. Co. v. Barnes, Ala., 405 So.2d 916 (1981). When a claim is `fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. Ibid.

"Under those authorities the plaintiff in a `bad faith refusal' case has the burden of proving:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." (Emphasis in original.)
Following the decisions in Chavers, Barnes, and Bowen, this Court established what is now known as the "directed verdict on the contract claim standard" in bad faith cases. See Burkett v. Burkett, 542 So.2d 1215, 1218 (Ala.1989). Writing for the Court in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982), Justice Shores stated:
"As noted by both sides in this case, the tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases. In [National Security Fire & Cas. Co. v. Bowen ], we set out the elements of the tort and attempted to show the plaintiff's burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
The Dutton Court's characterization of a plaintiff's burden of proof as a "heavy" one was no doubt prompted by the Court's previous recognition in Chavers of the necessity for allowing insurers a broad range of freedom to thoroughly evaluate claims and to decline payment in nonmeritorious cases. However, keenly aware of the fact *743 that there were countervailing policy considerations that weighed in favor of an insured's right to have his claim properly evaluated and promptly paid by the insurer, the Dutton Court, in articulating the standard to be applied in "normal" or "ordinary" bad faith cases, allowed for a different standard to be applied in certain unusual or extraordinary cases. Justice Jones, concurring specially in Dutton, elaborated on the majority's opinion:
"I concur completely with the opinion and write separately to elaborate on one point. The opinion correctly prefaces the `directed verdict on the contract claim' standard with the words `In the normal case'; and the phrase `if the evidence produced ... creates a fact issue ...' is preceded by the word `Ordinarily.' These are significant qualifications. Certainly, extreme cases will arise in which a fact issue will present a jury question on that claim. This is not the case before us; and, absent such circumstances, the `directed verdict on the contract claim' is the applicable standard for testing the tort of bad faith claim."
Later, Justice Jones, in his opinion concurring specially in Safeco Insurance Co. of America v. Sims, 435 So.2d 1219, 1224 (Ala. 1983), wrote:
"This `directed verdict on the contract claim' test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract. Indeed, the words `entitled to a directed verdict' so indicate. Rather, this test is intended as an objective standard by which to measure plaintiff's compliance with his burden of proving that defendant's denial of payment was without any reasonable basis either in fact or law; i.e., that defendant's defense to the contract claim is devoid of any triable issue of fact or reasonably arguable question of law.
"Exceptions to the `directed verdict' rule will undoubtedly arise. Take the case where the insurer insists that its refusal of payment was grounded solely on a particular entry in a hospital record, and plaintiff denies the very existence of such an entry. Merely because the insurer may be able to withstand a directed verdict motionthe existence vel non of the record entry itself being an issue of factwould not, as a matter of law, bar the plaintiff's tort claim. This extreme example is to be distinguished from the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from a hospital record entry. If the entry in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.
"Because of its potential relevance, one additional exception to the `directed verdict' test is suggested: Take the case of the insurer whose refusal of payment is based solely upon a legal position with respect to the controlling principles of law and its application to the undisputed facts giving rise to the claim. While the insurer, under the guise of asserting a legitimate defense, could not be heard to take issue with clear, well settled, elementary principles of contract law, certainly the rule of reasonableness dictates a field of operation for a denial of benefits based upon arguable legal grounds which are fairly debatable, even though the trial judge may correctly reject such arguments and direct a verdict for the insured.
"Thus, as we have seen, Dutton's use of the terms `In the normal case' and `Ordinarily' allows for exceptions to the `entitled to a directed verdict' test. In the first example, the insured may proceed with his bad faith claim even though he was not entitled to a directed verdict; and in the second example, the insurer would be entitled to a judgment on the tort claim even though the insured was *744 entitled to a directed verdict on the contract claim. Certainly these rare exceptions will not be difficult to recognize, nor will the general rule, because of rare exceptions, be difficult to apply." (Emphasis in original.)
Indeed, this Court was later confronted with cases in which the "directed verdict on the contract claim standard" was deemed inapplicable and the insurers were not permitted to avoid bad faith liability by putting on evidence sufficient to defeat the plaintiffs' motions for a directed verdict on the contract claims. In Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala. 1984), this Court stated that even if the plaintiff had not been entitled to a directed verdict on the contract claim, the bad faith claim would have been properly submitted to the jury. The Court in Kountz determined from the evidence presented at trial that the insurer intentionally failed to investigate the claim sufficiently to determine the existence of a valid reason for denying payment (i.e., the insurer failed to determine that the reason for the removal of the plaintiff's teeth was an injury, as claimed, not the pre-existing chronic periodontal disease). See, also, Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987). In both Kountz and Aetna, the Court, quoting Gulf Atlantic Life Ins. Co. v. Barnes, supra, recognized that an intentional failure on the part of an insurer to determine whether there was a lawful basis for denying a claim could be established with proof that the insurer either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review. In Aetna, the Court stated: "Considering the fact that the decision to deny [the claim] was made without the benefit of `critical' sections of the medical file, the jury could find that the claim was not `properly investigated,' and that there was a `reckless indifference to facts or to proof.'" 505 So.2d at 1053. See, also, Blue Cross & Blue Shield of Alabama v. Granger, 461 So.2d 1320 (Ala.1984), and Carter v. Old American Ins. Co., 544 So.2d 917 (Ala. 1989).
In Jones v. Alabama Farm Bureau Mutual Casualty Co., 507 So.2d 396 (Ala. 1987), the plaintiffs had a homeowner's policy that insured against damage caused directly by perils such as lightning, but not against damage caused indirectly, such as from a tree falling on the power line. During a storm the plaintiffs experienced problems with their electrical service, and several items of personal property were damaged. The plaintiffs and Alabama Farm Bureau Mutual Casualty Company ("Farm Bureau") disputed whether the damage was caused directly by a lightning strike or by a power surge when a tree limb fell on the power line. A Farm Bureau adjuster claimed that the plaintiff told him that the damage resulted when a tree limb fell on the power line. The adjuster's decision was based solely on what the plaintiff allegedly had told him. Farm Bureau argued that the factual dispute as to what the plaintiff had told the adjuster in the conversation precluded a directed verdict in favor of the plaintiff in the breach of contract action, and, therefore, under Dutton entitled Farm Bureau to a summary judgment on the bad faith claim. However, we held:
"The instant case is not the normal or ordinary case. As stated previously, the sole basis for the initial denial of Mrs. Jones's claim by Mr. Kratzer was Mr. Jones's alleged statement to Kratzer. It is the resolution of this factual issue, alone, that will determine the viability of Mrs. Jones's bad faith claim. Clearly, if Mr. Jones told Mr. Kratzer that lightning struck the house and that a tree limb fell on the service entrance line shortly thereafter, and that the damage to the service entrance line was the cause of the damage to the personal property, then Kratzer could have an arguable reason for summarily denying coverage. On the other hand, if Mr. Jones told Mr. Kratzer that he believed that the damage was caused by lightning, Mr. Kratzer would be under a duty to determine whether there was, in fact, any lawful basis for the denial of the claim. A simple examination of the personal property to determine *745 the cause of damage would be sufficient.
"Although the plaintiff's burden of proof in a bad faith action is great, it should not be insurmountable. Precluding a plaintiff's bad faith action by application of the `directed verdict on the contract claim' test when the disputed factual issue arises solely from a contradicted oral conversation between the insurer and the insured or a third person puts too onerous a burden on the plaintiff. Moreover, it would frustrate the purpose of the bad faith action by allowing an insurer simply to misrepresent the content of an oral conversation to avoid liability."
507 So.2d at 400-01.
In United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala. 1989), the insurer failed to pay the insured's claim under a "Medicare supplement" policy that read as follows:
"[I]f you have not established entitlement to hospital and/or medical insurance benefits under Medicare, we will pay the benefits provided under this policy as though you had established entitlement."
The insured, who was 64 years old, was not covered by Medicare at the time he submitted his claim. This Court held that the bad faith claim had been properly submitted to the jury, stating, in pertinent part, as follows:
"United American substantially asserts that it did not receive until June 7, 1985, the bills or letters or calls from Mr. Brumley or Hill or Green. `Although the plaintiff's burden in a bad faith action is great, it should not be insurmountable.' [Jones v. Alabama Farm Bureau Mutual Casualty Co.] at 401. To preclude Mr. Brumley's bad faith action by application of the `directed verdict on the contract' requirement, when the allegedly disputed factual issues arise solely from the statements of United American, would put too onerous a burden on Mr. Brumley. The policy noted in Jones is present here: it would frustrate the purpose of the bad faith action to allow an insurer to prevent a bad faith claim from going to the jury by feigning ignorance of the claim or misrepresenting the content of oral or written communications. Accordingly, we hold that the trial court did not violate the `directed verdict on the contract' requirement of bad faith claims by submitting the bad faith claim to the jury. Indeed, a directed verdict on the contract claim might well have been appropriate under these facts, but we need not reach that question."
542 So.2d at 1235-36.
As we stated earlier in this opinion, neither Ms. Thomas nor Principal Mutual was entitled to a judgment as a matter of law on the breach of contract claim. A fact question existed as to whether Ms. Warren was a "dependent" under the policy at the time of her death (i.e., a fact question existed as to whether she was "attending school on a full-time basis"). Ordinarily, if the evidence produced by either side creates a fact question with regard to the contract claim, the bad faith claim must fail. Ms. Thomas argues, however, that even if the trial court did not err in submitting the contract claim to the jury, this case does not fall within the category of a normal bad faith case. Rather, she argues, this is an extraordinary case where the "directed verdict on the contract claim standard" could not be applied. Principal Mutual takes the contrary positionthat there is nothing extraordinary about this case.
After carefully reviewing the record, we conclude that this case is not the "normal" or "ordinary" case to which the "directed verdict on the contract claim" standard is applicable. The evidence presented at trial persuades us that this case falls within the category of an extraordinary case, in which it would not be appropriate to allow the insurer to obtain a judgment as a matter of law on the bad faith claim by putting on evidence sufficient to defeat the plaintiff's motion for a directed verdict on the contract claim.
The record reveals that at the time she made her initial recommendation to deny Ms. Thomas's claim, Ms. Robbins was *746 aware that the only reason Ms. Warren had stopped attending the Mobile Academy was "because she was sick." Ms. Robbins's notation in the claim file indicates that she knew that Ms. Warren had undergone extensive chemotherapy treatments, had been in the hospital on numerous occasions, and had been completely bedridden for approximately six months immediately preceding her death. Ms. Robbins testified at trial that she based her recommendation on the information that had been given to her by Ms. Rehm. Ms. Robbins further testified that it was her understanding that Ms. Warren was neither enrolled in nor attending school at the time of her death and had not been for approximately 18 months prior thereto. Ms. Robbins also testified at trial that, in her opinion, Ms. Warren was not "attending school on a full-time basis," and, thus, that she was not a "dependent" at the time of her death. However, portions of Ms. Robbins's deposition testimony were admitted at trial. The following is an excerpt from that testimony:
"Q. Okay. When did [Principal Mutual] consider that she no longer qualified as being an insured, a dependent? Just give me a date and I will move on to something else.
"(No reply)
"Q. You can't give me a date?
"A. No.
"Q. But you know that as of the date of her death there was no coverage?
"A. Correct.
"Q. What's the basis of that opinion?
"A. She was not attending school on a full time basis.
"Q. Okay. But you told us that if she had paid the tuition in advance and had beenYou have already answered that. If, instead of contracting cancer, she had been involved in an automobile accident through this entire period of time and had been bedridden in a coma, would you have paid the benefits under those circumstances for Melinda Warren? She was a full time student just as your notes say there in September of 1985 and she's involved in an automobile accident that puts her in a coma. Would you have denied benefits in this case? It occurred while she was a full time student.
"A. I would have recommended they consider paying the claim.
"Q. So, you make a distinction between an automobile accident and an illness?
"A. She wasYou are saying she was in a coma?
"Q. Yes. Bedridden in a coma. You would have recommended
"A. And she was attending school on a full time basis at the time of the accident?
"Q. Yes.
"A. And she did not die until March of 1987?
"Q. Right.
"A. But the accident was in September of 1985?
"Q. Yes.
"A. I would have recommended that we consider paying the claim.
"Q. Your recommendation would have been just the opposite of what it was?
"A. Yes.
"Q. Okay. Why do you make a distinction between an illness and an accident?
"A. I am not making a distinction between an illness and an accident. She was in a coma.
"Q. Which made her physically incapable of attending classes?
"A. It would have made her
"Q. All right. Do you think Melinda Warren was physically capable of attending classes?
"A. I don't know.
"Q. Would that have influenced your decision?
"A. If she had been physically capable?
"Q. Yes. Physically incapable.
"A. Incapable?
"Q. Yes.
"A. Yes, it would have had an effect on my decision.
"Q. You told us that you knew she had ovarian cancer. She was receiving chemotherapy. She was bedridden from some time in October or early November. *747 Didn't you know those things when you denied this claim?
"A. She wasI knew she was bedridden six months before she died.
"Q. Well, I am asking you just to assume that this girl was so sick that she couldn't do anything after September of 1985. Just assume that to be the case, that she was too sick to attend school. Would that have altered your decisionI am sorry. Would that have altered your decision as to whether or not to pay this claim?
"A. It would have had an effect on my decision.
"Q. In what way?
"A. If she was too sick to attend school and you are saying that we are using
"Q. She was too sick to attend school after her last full time attendance. And if that is the case, don't you think her mother should have received the death benefits, if that was the case?
". . . .
"Q. I will ask you to assume September. But after September she was physically too ill to attend classes. If that had been the facts of this case, then, in your opinion, she should have received the death benefits or her mother should have. Isn't that correct?
"A. I guess I would have recommended if she was physically incapable of getting up and attending schoolif she was bedridden, I would have recommended to pay.
". . . .
"Q. You would have recommended that she be paid?
"A. If she was bedridden from September `85 through her death.
"Q. Don't you think it fair and reasonable to determine the eligibility and that is whether or not they are attending school on a full time basis as of the date of the accident or as of the date of the illness as opposed to the time of death?
"MS. HARE: Objection.
"Q. Isn't that the only fair and reasonable way to interpret the provisions of this policy?
"THE COURT: Overruled. Both objections overruled.
"A. Every case is different.
"Q. Well, isn't that the fairest way to interpret this definition if they are
". . . .
"Q. If they are a full time student on the day they become stricken by a fatal illness or involved in a catastrophic accident. That should determine their eligibility as to whether or not they are entitled to death benefits shouldn't it?
"MS. HARE: Objection.
"Q. As opposed to whether or not they lived three months or six months or two years or are bedridden or in a coma. The eligibility should be determined as of the date of the accident or the contraction of the illness.
"MS. HARE: Objection.
"Q. You agree with that?
"MS. HARE: Objection. She has already told you, John, that that's one consideration. But, no, that's not the only thing they look at.
"Q. Do you agree with that?
"A. Yes.
"MS. HARE: Objection."
The jury could have inferred from this testimony that Ms. Robbins was confused as to whether Ms. Thomas was entitled to recover under the policy. Based upon the information that she placed in the claim file, the jury also could have found that had Ms. Robbins carefully reviewed the claim, she would have realized that Ms. Warren had to withdraw from school after September 1985 because she was physically incapable of attending classes. Viewing the evidence in a light most favorable to Ms. Thomas, as we are required to do, we think that the jury could have reasonably found from all of the evidence (i.e., the information in the claim file, the rule prohibiting a narrow and unreasonable interpretation of policy language that was contained in the claims manual, and the custom or practice within the insurance industry of paying such claims) that, at the time she made her initial recommendation to deny the claim, Ms. Robbins simply failed to subject the results of her investigation *748 (i.e., the information accumulated in the claim file) to a cognitive evaluation and review.
Mr. Wallace testified at trial that he carefully reviewed Ms. Thomas's claim and that he denied it because the claim file indicated that Ms. Warren was not enrolled in and did not attend the Mobile Academy after September 1985. However, portions of his deposition testimony were also admitted into evidence at trial. The record shows the following:
"Q. Mr. Wallace, what happened in this file, to be honest, is that the recommendations of these claims people came to you and you just rubber stamped it didn't you?
"A. I never do that on a claim.
"Q. You didn't even really know or appreciate the fact that she was not able to physically attend school did you?
"A. I knew the dates that were involved here and how long a time had lapsed since she had been not only attended [sic] but had not been enrolled in school when I made my determination.
"Q. Well, on page 14 of your deposition when I asked you about that, do you remember the question? Question: `It wouldn't have made any difference to you as to the cause of her inability to physically to be at class on the date of her death, would it?' Answer: `Had we been told that based on the information, you know, I would have taken that into account, certainly.' Wasn't that your answer?
"(No audible response.)
"Q. And then the next question
"A. Could I answer it?
"Q. Oh, yes.
"A. I would have taken that into consideration, the cause of her disability.
"Q. But you said, `had we been told that based on the information, you know, I would have taken that into account, certainly.' That indicates that you didn't; but if you had known it, you would have, doesn't it?
"A. Well, it was in the claim file.
"Q. Yes. But you didn't read the claim file did you? You just rubber stamped what the people under you sent up?
"A. I wouldn't have done that.
"Q. Well, doesn't this indicate that you didn't know that she was physically unable to attend class?
"A. It just saidI think I took this You said the cause of her inability to physically be able to attend class. It doesn't talk about her
"Q. Go ahead.
"A. I would have taken into account the cause of her disability, yeah.
"Q. But you didn't?
"A. Uh-huh.
"Q. You didn't at the time you rubber stamped the recommendation of the people under you, did you?
"A. I maybeI maybe would have taken thatI am sure I took it into consideration. But we are talking about 18 months here after
"Q. Let's read the question again. Question: `It wouldn't have made any difference to you as to the cause of her inability to physically be at class on the date of her death, would it?' Answer: `Had we been told that based on the information, you know, I would have taken that into account, certainly.' Question: `You would have?' Answer: `On her inability to be in class?' Question: `Yes.' Answer: `That could have been part of my determination.' Question: `Did you request a medical report?' Answer: `No. Based on the medical in the file there didn't appear to be any need to do that.' Question: `Did you think she was physically able to attend classes?' Answer: `According to the information that I had when I initially denied it, she was not enrolled in school. So, there wasn't any reason to continue the investigation.' Question: `So, you felt like she was not attending school on a full time basis because she was not enrolled?' Answer: `I didn't feel that. I was told that.' Question: `You were told that?' Answer: `Uh-huh.' Question: `Did you see the report from the Mobile Academy of Hair Design and from the State Department *749 of Cosmetology that showed that she had re-enrolled in March of 1985?' Answer: `That was not provided to us, no.' That was in the file wasn't it?
"A. Not when I saw it.
"Q. Okay. Question: `Did you ask for it?' Answer: `I was told that she wasn't enrolled so I wouldn't have asked for it.' Question: `Somebody told you that she wasn't enrolled at the time of her death and based on that you went along with the agreement to deny the claim?' Answer: `That's correct.' And that's really what happened in this claim isn't it, Mr. Wallace?
"A. I denied it because of the length of time that she wasn't enrolled in school, wasn't attending school on a full time basis."
Although he testified at trial that, in his opinion, Ms. Warren was not "attending school on a full-time basis" and, thus, that she was not a "dependent" at the time of her death, the jury could have reasonably inferred from his testimony that Mr. Wallace was also confused as to exactly what circumstances would warrant payment. In fact, viewing his testimony as a whole, we conclude that a fact question was presented as to whether Mr. Wallace carefully reviewed Ms. Thomas's claim, or, instead, simply "rubber stamped" the recommendations of Ms. Robbins and Ms. Davis. The credibility of both Ms. Robbins and Mr. Wallace was certainly a matter for the jury.
As previously noted, Ms. Davis and Mr. Kaplan appear to have steadfastly maintained that Ms. Warren lost her status as a "dependent" under the policy after September 1985, notwithstanding the fact that she was rendered physically incapable of attending classes by a terminal illness. We note that Ms. Ford did not testify. We also note that Mr. Wallace apparently did not participate in the second review of Ms. Thomas's claim.
The existence vel non of bad faith must not be determined in a vacuum, but under the particular circumstances of each case existing at the time the insurer denied the claim. The evidence in this case was such that the jury could have reasonably found: that Principal Mutual contracted with the University to provide life insurance for its employees and their "dependents"; that the policy was payable upon the death of a "dependent," whether death was the result of an accident or an illness; that each claim submitted to Principal Mutual was reviewed on a case-by-case basis; that policy language was not always interpreted literally; that a manual promulgated by Principal Mutual and used by its claims examiners prohibited a narrow and unreasonable interpretation of the language of the policy; that according to the custom and practice within the insurance industry, Ms. Warren should have been considered to be a "dependent" within the meaning of the policy because she was rendered physically incapable of attending school by a debilitating illness that eventually caused her death; that at least two of the examiners who reviewed Ms. Thomas's claim, Ms. Robbins and Mr. Wallace, exhibited confusion as to exactly what circumstances would warrant payment within the context of this case; that all of the examiners involved in the review of the claim, including Ms. Davis and Mr. Kaplan, apparently disregarded the claims manual and placed a narrow and restrictive interpretation on the policy language that was contrary to the interpretation generally placed on such language within the industry; and finally, and perhaps most importantly, that throughout the claims review process, Principal Mutual's examiners either intentionally or recklessly failed to subject the results of the investigation to a cognitive evaluation and review.
In the letter denying the claim, Ms. Robbins misstated the facts: "[Ms.] Warren was last on the role [sic] at school through September 1985. She then became disabled and died on March 10, 1987." (Emphasis supplied.) Principal Mutual's claim file showed: "Only reason she wasn't in school beyond 9/85 was because she was sick." It appears to us that Principal Mutual refused to believe what all of the evidence that it had before it showedthat Ms. Warren could not attend school from September 1985 until her death because *750 she was dying of cancer. Ms. Warren's physician testified that he did not believe that Ms. Warren could physically attend school after June 1985. However, she did attend through August 1985. There was nothing to substantiate Principal Mutual's assertion that Ms. Warren became disabled after she had ceased attending school. To the contrary, all of the evidence showed that Ms. Warren stopped attending school because she was physically unable to attend.
All of this illustrates why this case falls within the category of unusual or extraordinary cases. If the "directed verdict on the contract claim standard" were applied, Principal Mutual would be allowed to obtain a judgment as a matter of law on the bad faith claim, even though a factual question was presented as to whether its claims examiners either intentionally or recklessly failed to subject the results of the investigation to a cognitive evaluation and review and, thereby intentionally failed to determine prior to denying the claim whether there was, in fact, a lawful basis for denial. This Court's decisions in Aetna Life Ins. Co. v. Lavoie, supra, and Continental Assurance Co. v. Kountz, supra, would not allow such a result. Furthermore, the very existence vel non of Principal Mutual's alleged lawful basis for denying Ms. Thomas's claimthat Ms. Warren was not a "dependent" within the meaning of the policyis itself a question of fact only because of the testimony of employees of Principal Mutual (i.e., the examiners who reviewed the claim) as to the intent of the policy. Under these circumstances, the "directed verdict on the contract claim standard" did not bar the jury's consideration of the bad faith claim. See United American Ins. Co. v. Brumley, supra, and Jones v. Alabama Farm Bureau Mutual Casualty Co., supra. For the foregoing reasons, we hold that the trial court erred in entering a judgment notwithstanding the verdict for Principal Mutual on the bad faith claim.
We note that because the trial court entered a judgment as a matter of law for Principal Mutual on the bad faith claim, it was unnecessary for it to consider whether the $750,000 damages award was excessive, an issue that was raised by Principal Mutual in its post-judgment motion. Any future consideration of this issue should be in accordance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
88-834 REVERSED AND REMANDED WITH DIRECTIONS.
88-925 AFFIRMED.
HORNSBY, C.J., and JONES and ADAMS,[*] JJ., concur.
ALMON, STEAGALL and KENNEDY, JJ., concur in the result.
MADDOX, J., concurs in part and dissents in part.
MADDOX, Justice (concurring in part; dissenting in part).
Mr. Justice Almon, in a dissenting opinion in Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1 (Ala.1981), said the following about the new tort of bad faith refusal to pay an insurance claim established in that case:
"Setting aside for the moment the facts, or I should say the lack of facts, in this case and my personal views on the tort of bad faith, I have serious questions concerning the majority's opinion. According to the test adopted by the majority, `an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."' The majority fails, however, to establish the parameters of this tort by not defining what constitutes a `lawful basis.'
"* * * *
"I ... question the reach of the majority's opinion. Although couched in terms of an insurer's breach of its duty of good faith and fair dealing, the language of *751 the opinion, as well as the authority relied upon to justify the recognition of the tort, is arguably broad enough to imply this duty in every contractual relationship."
405 So.2d at 15.
Today's opinion by the Court confirms the fears expressed by Mr. Justice Almon in the Chavers case, and once again authorizes the recovery of punitive damages against an insurer for failing to pay a claim that was seriously disputed, the validity of which has only finally been determined today in this appeal. To authorize the recovery of punitive damages in such a factual setting, in my opinion, is a misapplication of the law of contracts, and effectively allows for the recovery of punitive damages against an insurer without affording the insurer due process of law. The majority's conclusion that this case "falls within the category of an unusual or extraordinary case" tends to confirm what Mr. Justice Almon pointed out in his dissent in Chaversthat there are no "parameters" or boundaries for the tort. I believe that the opinion expands the tort of bad faith and does not correctly state the law of contracts, the reasonable expectancies of the parties under such contracts, and the damages that can be awarded in cases of a breach. Consequently, I am compelled to dissent once again, as I have done over the years since the tort of bad faith was recognized.[2] I hesitate to continue to express a dissenting view, but I am convinced that, under the facts of this case, the trial judge was correct in granting the insurer's motion for judgment notwithstanding the verdict, and I am especially troubled by the holding, which allows the recovery of punitive damages for an insurer's failure to pay a claim that has only today been judicially determined to be a valid claim.
My view of the law in this area has been expressed in several dissenting and special concurring opinions. In Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987), I spelled out in some detail in a special concurrence my views on the tort of bad faith refusal to pay an insurance claim, and I attempted to state my view of the law of insurance contracts and the failure to pay claims and how the matter could best be handled in view of the public policy considerations involved. I also stated in that special concurrence the reasons for the dissents I had previously filed in bad faith cases. I do not restate those views here, but refer the reader to that special concurrence. I still believe the views I expressed there to be legally correct.[3]
Even though my view of the law of insurance contracts has not received much following, and even though the legislature has not seen fit to enter the field of regulating the new tort except to pass legislation setting a cap on the recovery of punitive damages, I continue to believe that the legislature is the proper body to resolve the public policy questions surrounding these controversies and that the tort of bad faith failure to pay is an inappropriate method for resolving the public policy issues.
Accepting the fact that this Court has established the tort of bad faith failure to pay an insurance claim, I cannot accept the conclusion of the majority that this case "falls within the category of an unusual or extraordinary case." In my opinion, this case is no different from the ordinary case in which there is a dispute about insurance coverage. Because of that fact, I am convinced that the plaintiff should not be permitted to recover punitive damages in any amount, and certainly not in the sum of $750,000. I was almost convinced that the trial court was incorrect in denying the insurer's motion for judgment notwithstanding the verdict on the contract claim, on the ground that the evidence showed that the dependent was not enrolled in school on the date of her death, but there was evidence that the contract language was ambiguous and that reasonable persons could disagree on the question of coverage. *752 Does that mean that punitive damages should be allowed? I think not.
The issue of coverage was disputed from the beginning and was only finally resolved by this Court today; therefore, the trial judge did not err in granting the insurer's motion for judgment notwithstanding the verdict. Consequently, I must respectfully disagree with the Court's holding that a jury question was presented on the bad faith claim. Also, to allow the recovery of $750,000 in punitive damages, under the facts of this case, has serious "due process" implications, especially in view of the fact that there are no set parameters for determining when such damages are recoverable and what will be the "unusual or extraordinary" case. See my dissent in Pacific Mutual Life Ins. Co. v. Haslip, 553 So.2d 537, 544 (Ala.1989).
Based on the foregoing reasons, I concur in the judgment in Case No. 88-925, but I dissent in Case No. 88-834.
NOTES
[1] Mr. Kahalley testified, in pertinent part, as follows:

"Q. Let me give you a hypothetical to be extra clear: Assume that this young lady is between the ages of 19 and 25. Assume that she is living at home with her mother. Assume that she is dependent upon her mother for her principal support and maintenance. Assume that on March 19th, 1985, she re-enrolled in the Mobile Academy of Hair Design. In May of 1985Oh, at that time she paid her full entry fee for a full 1200 hours. She paid the full $600.00 registration fee and tuition fee for 1200 hours. This was not a school on a quarter or semester basis.... She had her surgery in 1985, May 1985. That Dr. Clarkson has testified that as of June 1985 when she started getting chemotherapy that he would not expect her to be able to attend class any more. Assume that her last dayeven though Dr. Clarkson said in June she was disabled her last day in class was in August of 1985. That in September 1985 she could no longer be physically present in class. And Ms. Tanneralthough she will testify that Melinda was fully paid up, she could come back whenever she couldhad to send her permit back and took her off of her rolls because there was no reason [inaudible] every day and ... she died March 1987. Under the terms of this policy would she be covered for dependent life insurance?
"A. Yes.
"Q. Are you familiar with the practices and customs of the insurance industry?
"A. Yes.
"Q. Is that an opinion that reasonable people in the insurance industry could differ with?
". . . .
"A. Those people who have had any experience with adjudication of claims, that is with actually dealing with the policy language, I
[Footnote one continued on page 740].
don't think they would differ on that opinion, no.
"Q. Let me show you something else that came out of the defendant's own claim file and ask you to read that into the record?
"A. Where it says message. I am not sure I can read that.
"Q. Read just this bottom line for one thing.
"A. `The only reason she wasn't in school beyond 9/85 was because she was sick.'
"Q. Would that further support your opinion that this life insurance policy should have been paid?
"A. Sure.
"Q. And this is a document signed by JoAnn Robbins saying that she knew; is that correct?
"A. I assume so, yes.
"Q. What does it say on 4/24/87? Can you read that into the record?
"A. `Last on roll at school through September `85, last year and ten months in and out of hospital, approximately 30 times. Also went on chemo, out patient' something
"Q. Treatment.
"A. Is that `treatment'? `Last six months before death she was completely bedridden.'
"Q. Would that further support your opinion?
"A. Oh, most definitely."
[*] Justice Adams did not sit at oral argument, but has listened to the audio tape of the arguments.
[2] See my dissenting opinions in Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala. 1981), and Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala. 1984).
[3] I joined in the disposition of that particular case because of the peculiar facts that surrounded it, as my special concurrence shows.